# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

# NO. 22-20434

---

**TIMOTHY KLICK; WILTON CHAMBERS; MALIK ALEEM;
JOHN POTTER; ANTHONY D. WOODS,**
**Plaintiffs – Appellees,**
v.
**CENIKOR FOUNDATION,**
**Defendant – Appellant**

---

**On Appeal from the United States District Court
For the Southern District of Texas, Houston Division**

---

**BRIEF OF APPELLANT CENIKOR FOUNDATION**

---

David M. Gregory
Chris Dove
Andrew W. Reed
Kathleen Grossman
600 Travis Street, Suite 2800
Houston, Texas 77002
dgregory@lockelord.com
cdove@lockelord.com
andrew.reed@lockelord.com
kathleen.grossman@lockelord.com
Tel: (713) 226-1344
Fax: (713) 223-3717

**ATTORNEYS FOR DEFENDANT/
PETITIONER**

Frank Sommerville
WEYCER, KAPLAN, PULASKI
& ZUBER, P.C.
3030 Matlock Rd., Suite 201
Arlington, Texas 76015
fsommerville@wkpz.com
Tel: (817) 795-5046
Fax: (800) 556-1869

**OF COUNSEL FOR DEFENDANT/
PETITIONER**

# <u>Certificate Of Interested Persons</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.      The Defendant / Appellant is:

        Cenikor Foundation

2.      The original Plaintiffs / Appellees in the consolidated cases are:
        Timothy Klick
        Malik Aleem
        John Potter
        Anthony Woods
        Wilton Chambers[1]

        Within the consolidated cases (No. 4:19-cv-3031, 4:19-cv-3032, 4:19-cv-3033, and 4:19-cv-4569) approximately 226 individuals have filed notices of consent to join this action as putative opt-in plaintiffs. The names of these putative opt-in plaintiffs, as reflected in PACER and publicly filed documents, are listed on Exhibit A to this Brief.

3.      Appellant is represented by:

        David M. Gregory
        Chris Dove

---

[1] Gregory Sorey was the original named plaintiff in Case No. 4:19-cv-3033. On November 1, 2021, the district court dismissed Sorey and substituted Chambers as the named plaintiff. ROA.28.

Andrew W. Reed
Kathleen Grossman
**Locke Lord LLP**

Frank Sommerville
**Weycer, Kaplan, Pulaski & Zuber, P.C.**

5.  Appellees are represented by:

<u>For All Appellees</u>:
Josh Borsellino
**Borsellino, P.C.**

<u>For Malik Aleem, John Potter, and Anthony Woods</u>:
Charles Stiegler
**Stiegler Law Firm, LLC**

<u>For John Potter and Anthony Woods</u>:
John Bullman
**Blackwell & Bullman, LLC**

<u>For Anthony Woods</u>:
Josh Sanford
**The Sanford Law Firm**

<u>/s/ Chris Dove</u>
Chris Dove

## Statement Regarding Oral Argument

Appellant Cenikor Foundation believes that oral argument would assist this Court. This case presents two compelling legal issues:

(1) The Fifth Circuit should (a) join the many other circuits that adopted a legal test recognizing that drug-rehabilitation patients, volunteers, and interns who work without expectation of payment are not "employees" under the Fair Labor Standards Act, and (b) hold this test prevents certification of a collective action in this case; and

(2) The district court should not require Cenikor to violate federal regulations that fiercely protect the privacy of drug-rehabilitation patients, just so it can exercise its optional power to send notice of the Plaintiffs' lawsuit to Cenikor's former patients.

This brief will demonstrate that this Court should answer these questions in Cenikor's favor. But oral argument may assist the court in resolving these legal issues and then applying that law to the facts of this case.

# Table Of Contents

Page

Jurisdictional Statement ........................................................................14

Issues Presented For Review ................................................................15

Introduction ............................................................................................16

Statement Of The Case .........................................................................17

I.    Cenikor provided a drug treatment program that used work
      as part of its therapeutic approach.............................................17

  A.    Cenikor provided a long-term residential drug-treatment
        program at little or no cost. ...................................................17

  B.    The Therapeutic Community model applies a strict
        regimen that recognizes patients must learn to work in
        order to overcome substance abuse. .....................................19

  C.    Cenikor used the Therapeutic Community work model,
        and made absolutely clear that patients are not
        "employees" and would not receive wages. ..................................20

    1.    Orientation introduces patients to the therapeutic
          community....................................................................................20

    2.    Primary Treatment introduces work as therapy, but clearly
          states that patients are not "employees" and will not
          receive wages...............................................................................21

    3.    Reentry transitions the patients back into the community. .........23

  D.    Every Cenikor patient has a different story....................................24

II.    Plaintiffs filed FLSA collective action lawsuits against
       Cenikor for failure to pay them wages as "employees."..................26

  A.    Plaintiffs filed six different lawsuits against Cenikor....................26

  B.    Plaintiffs sought to certify their lawsuits as collective
        actions under the FLSA.......................................................................28

    1.    Plaintiffs moved to certify and send notice of the lawsuit
          to Cenikor's other patients. ..........................................................28

2.  Cenikor responded by challenging the legal test, the application of that test, and the propriety of sending notice that violated federal regulations.......................................29

C.  The district court certified the collective action, and eventually ordered that Cenikor must identify its former patients. ....................................................................................31

D.  The district court clarified how notice would be given, and certified its certification and notice decisions for immediate interlocutory appeal. ........................................32

Summary of the Argument...................................................................33

I.  This Court should reverse the district court's certification decision.............................................................................................33

II.  The district court violated federal privacy laws by ordering disclosure and use of patient identifying information. ...................34

Argument ..............................................................................................35

I.  This Court should explain the proper test for whether rehab patients are FLSA "employees," and reverse the district court's order certifying Plaintiffs' claims as an FLSA collective action......................................................................................35

A.  In this case, the proper test of "economic reality" requires the court to assess each plaintiff's expectation of compensation and the principal purpose of the relationship. ........................................................................36

1.  The proper test considers the promise or expectation of compensation in exchange for work, and Cenikor's patients receive benefits even if they do not work....................39

2.  Cenikor's form adopts the very language that the Ninth Circuit held did not create an express or implied expectation of in-kind benefits. ....................................44

3.  Other courts have held that expectation of compensation is a necessary threshold inquiry, whereas the district court held it is "irrelevant." ........................................46

4.  In addition to expectation of compensation, the proper test considers the principal purpose of the relationship..................48

i.    *Vaughn* reasoned that drug-rehab patients, like interns, were the primary beneficiaries of the relationship...............49

ii.   *Fochtman* found that "drug offenders" were the primary beneficiaries of a court-order rehab program.........50

iii.  *Armento* held that veterans were the primary beneficiaries of a rehabilitation and training program.........51

iv.   This Court should adopt these court's analyses. ...................53

5.  The primary beneficiary test requires individualized inquiries that defeat FLSA collective action because plaintiffs will not be "similarly situated." ...................54

B.   Cenikor's defenses prove that the Plaintiffs are not "similarly situated." ............................................................58

1.  Defenses must be part of the FLSA certification analysis, and cannot be pushed aside until some later date. ...................59

2.  Cenikor's offset defense requires highly individualized inquiries that render certification improper.............................61

3.  Cenikor's MCA Defense requires highly individualized inquiries that make certification improper. .................................63

4.  Cenikor's Rooker-Feldman Doctrine defense requires highly individualized inquiries rendering certification improper..........................................................................................65

C.   Conclusion: This Court should reverse the district court's certification decision.........................................................66

II.   The District Court's Certification Order Requires Cenikor Violate Federal Privacy Laws and Regulations that Protect the Identity of Substance Use Disorder Patients...............................67

A.   Privacy statutes scrupulously protect substance abuse patient identifying information, including names. ......................67

B.   Courts may compel disclosure of protected identifying information only in narrow circumstances....................................69

C.    The district court did not comply with mandatory requirements for an order to disclose patient identifying information. ........................................................................71

1.    The district court is not free to rewrite the laws. ...........................71

2.    The district court is not free to declare the law "redundant," nor could it depend on prior consent given for a different purpose. .....................................72

3.    The district court did not and could not make the mandatory finding that there was no other way of obtaining the information...........................................73

4.    The district court made no finding of good cause, whereas the only case on point found no good cause on similar facts. .................................................................74

D.    This Court should distinguish the cases cited by the district court. ...............................................................................77

Conclusion And Prayer ........................................................................80

Signature ...............................................................................................82

Certificate of Service .........................................................................83

Certificate of Compliance .................................................................84

Exhibit A: List of Opt-In Plaintiffs .................................................85

# <u>Index of Authorities</u>

**Page(s)**

## Cases

*Aboin v. IZ Cash Inc.,*
    No. 4:20-CV-03188, 2021 WL 3616098 (S.D. Tex. June 29,
    2021) ...............................................................................................61

*Acosta v. Cathedral Buffet, Inc.,*
    887 F.3d 761 (6th Cir. 2018)................................................ 46-47, 48

*Alvarado Guevara v. I.N.S.,*
    902 F.2d 394 (5th Cir. 1990)............................................................37

*Alvarez v. NES Glob. LLC,*
    No. 4:20-CV-1933, 2021 WL 3571223 (S.D. Tex. Aug. 11,
    2021), reconsideration denied, 2021 WL 4593985 (Oct. 6,
    2021) ...............................................................................................60

*Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.,*
    856 F. App'x 445 (4th Cir. 2021) ....................................37-38, 51-53

*Carr v. Allegheny Health, Educ. & Research Found,*
    933 F. Supp. 485 (W.D. Pa. 1996)...................................... 69-70, 76

*U.S. ex rel. Chandler v. Cook Cty., Ill.,*
    277 F.3d 969 (7th Cir. 2002)............................................................75

*Clay v. New Tech Glob. Ventures, LLC,*
    No. 16-296-JWD-CBW, 2019 WL 1028532 (W.D. La. Mar. 4,
    2019) ...............................................................................................60

*Doe v. Meachum,*
    126 F.R.D. 444 (D. Conn. 1989)................................................77, 79

*Donovan v. Am. Airlines, Inc.,*
    686 F.2d 267 (5th Cir. 1982).......................................46, 47, 48, 53

*Donovan v. Tony and Susan Alamo Foundation*,
  567 F. Supp. 556 (W.D. Ark. 1982), *modified*, No. CIV. 77-2183,
  1983 WL 1982 (W.D. Ark. Feb. 7, 1983) ............................................ 39-40, 45

*Ellison v. Cocke Cty. Tenn.*,
  63 F.3d 467 (6th Cir. 1995) (J. Ryan, concurring) ................................... 69, 76

*Eltayeb v. Deli Mgmt., Inc.*,
  No. 4:20-CV-00385, 2021 WL 5907781 (E.D. Tex. Dec. 14,
  2021) ................................................................................................................ 61

*In re Employment Records of John Does Employed By Sharpe
  Holding, Inc.*, No. 417MC238-RLW, 2017 WL 6547738 (E.D.
  Mo. Dec. 20, 2017) ..................................................................................... 74-75

*Fochtman v. Hendren Plastics, Inc.*,
  47 F.4th 638 (8th Cir. 2022) ................................................................. 48, 50-51

*Fuller v. Jumpstar Enters., LLC*,
  No. H-20-1027, 2021 WL 5771935, at *8 (S.D. Tex. Dec. 6,
  2021) ................................................................................................................ 59

*Glatt v. Fox Searchlight Pictures, Inc.*,
  811 F.3d 528 (2d Cir. 2016) .............................................................................. 48

*Goldberg v. Whitaker House Coop., Inc.*,
  366 U.S. 28 (1961) ............................................................................................ 37

*Harker v. State Use Indus.*,
  990 F.2d 131 (4th Cir. 1993) ............................................................... 48, 51-52

*Hebert v. TechnipFMC USA, Inc.*,
  No. 4:20-CV-2059, 2021 WL 1137256 (S.D. Tex. Feb. 5, 2021) ................... 59

*Heredia v. Tate*,
  No. 3:19-cv-00338-jdp (W.D. Wisc., Dec. 22, 2020) ................................. 77-78

*Hoffman-LaRoche v. Sperling*,
  493 U.S. 165 (1989) .......................................................................................... 76

*Hopkins v. Cornerstone Am.*,
  545 F.3d 338 (5th Cir. 2008)................................................................52

*Isaacson v. Penn Cmty. Servs., Inc.*,
  450 F.2d 1306 (4th Cir. 1971).............................................................48

*Lafley v. SeaDruNar Recycling, L.L.C.*,
  138 Wash. App. 1047 (2007) (unpublished) .....................................44

*Marquis v. Sadeghian*,
  No. 4:19-CV-626-RWS-KPJ, 2021 WL 6621686 (E.D. Tex. Dec.
  30, 2021) ...............................................................................................61

*Ndambi et. al v. Core Civic, Inc.*,
  990 F.3d 369 (4th Cir. 2021).................................................................37

*Parrish v. Premier Directional Drilling, L.P.*,
  917 F.3d 369 (5th Cir. 2019)................................................................39

*Putnam v. Eli Lilly & Co.*,
  508 F.Supp.2d 812 (C.D.Cal. 2007)...............................................77, 79

*Reyes v. Tex. Ezpawn, L.P.*,
  No. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007)...............59

*Rosales v. Indus. Sales & Servs., LLC*,
  No. 6:20-CV-00030, 2021 WL 4480747 (S.D. Tex. Sept. 30,
  2021) ...............................................................................................60, 63

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947)..............................................................................37

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
  642 F.3d 518 (6th Cir. 2011)...............................................................48

*Steelman v. Hirsch*,
  473 F.3d 124 (4th Cir. 2007)...............................................................52

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone)*
    *Antitrust Litig.*, MDL No. 2445, No. 13-MD-2445, Civ. A. No.
    16-5073 (E.D. Pa. Dec. 3, 2021) ................................................................. 77-79

*Swales v. KLLM Transp. Servs., LLC,*
    985 F.3d 430 (5th Cir. 2021) ....................................................................*passim*

*T.S. v. The Burke Foundation*,
    521 F. Supp. 3d 691 (W.D. Tex. Feb. 22, 2021) ........................................ 53-54

*Tony and Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985) ...................................................................................*passim*

*Torres v. Chambers Protective Servs., Inc., et al.*,
    No. 5:20-CV-212-H, 2021 WL 3419705 (N.D. Tex. Aug. 5,
    2021) .................................................................................................................60

*Trottier v. FieldCore Servs. Sols., LLC*,
    No. 2:20-CV-186-Z-BR, 2022 WL 658765 (N.D. Tex. Mar. 4,
    2022) .................................................................................................................59

*Truong v. Bank of Am., N.A.*,
    717 F.3d 377 (5th Cir. 2013) ..........................................................................65

*Vaughn v. Phoenix House Found., Inc.*,
    957 F.3d 141 (2d Cir. 2020) ...................................................................... 49-50

*Walling v. Portland Terminal Co.*,
    330 U.S. 148 (1947) ...................................................................................37, 39

*Wang v. Hearst Corp.*,
    203 F. Supp. 3d 344, 349-55 (S.D.N.Y. 2016), aff'd, 877 F.3d 69
    (2d Cir. 2017) ...................................................................................................56

*Williams v. Strickland*,
    87 F.3d 1064 (9th Cir. 1996) ..................22, 44-46 BA_Cite_427FA8_000274

**Statutes**

29 U.S.C. § 216(b)........................................................................28, 35

42 U.S.C. § 290dd-2 .......................................................... 67, 69-72, 74

**Legislative Materials**

H.R. Rep. No. 775, 92d Cong., 2d Sess. (1972) ..................................69

**Regulations**

29 C.F.R. § 553.106 ...........................................................................41

29 C.F.R. § 782.5 ...............................................................................64

42 C.F.R. § 2.4 ...................................................................................69

42 C.F.R. § 2.11 ...................................................................... 68, 71-72

42 C.F.R. § 2.13 .................................................................................68

42 C.F.R. § 2.64 ...................................................................70-71, 73-74

La. Adm. Code tit. 48 .........................................................................43

Tex. Adm. Code Chapter 448 .............................................................43

## Jurisdictional Statement

The federal courts have subject-matter jurisdiction over this litigation under 28 U.S.C. § 1331 because Plaintiffs sued Cenikor under the federal Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ROA.36-37.

This Court has interlocutory appellate jurisdiction under 28 U.S.C. § 1292(b). Both the district court and this Court gave Cenikor permission to appeal the district court's orders certifying an FLSA collective action and requiring Cenikor to provide information that is protected by federal privacy regulations. ROA.1567; ROA.1572.

**Issues Presented For Review**

1.    To evaluate whether drug rehabilitation patients are FLSA "employees," the district court rejected the tests applied by circuit courts in favor of an inappropriate test, and then certified a collective action. The court held the defendant had not proved its defenses defeated certification, but also that some defensive issues would be considered later.

- *Did the district court err by certifying an FLSA collective action?*

- *What test determines FLSA "employee" status in cases like this one?*

- *What evidence should courts examine as part of that determination?*

- *Who has the burden of proving whether defenses prevent certification, and may a court postpone its consideration of those defenses until later?*

2.    Federal law strictly prohibits the disclosure or use of the identifying information of patients in substance abuse programs, unless courts follow specific procedures. The district court disregarded many of those procedures and ordered the defendant drug-treatment program to disclose its current and former patients' contact information.

- *Did the district court err by ordering the defendant/appellant to disclose its patients' information?*

## Introduction

The circuit courts agree: an individual is not an "employee" entitled to the protections of the Fair Labor Standards Act if he did not expect compensation in exchange for his labor, but worked instead for his own benefit. And they agree that patients who perform work as part of their drug rehabilitation therapy are not "employees" entitled to a minimum wage. Patients come to rehab facilities for sobriety, not a job.

But the district court rejected the circuit court holdings and applied a different test that makes no sense when applied to volunteers, interns, trainees, or drug-rehab patients. The court expressly refused to consider the fact that the patients in Cenikor's drug rehabilitation program knew they would not receive wages. And because the court ignored legal issues that must be decided individually, it wrongly concluded that Cenikor's patients were "similarly situated" and could pursue a collective action against Cenikor for unpaid wages. The court then violated this Court's recent case law by postponing its consideration of whether Cenikor's defenses prevent a collective action.  When the correct test is applied and all the evidence considered, individualized issues prevent collective action.

The district court then multiplied its error by declaring that Cenikor must disclose federally protected patient information so that it could exercise its optional power to send notice of the lawsuit to Cenikor's former and current patients. The district court disregarded the mandatory requirements of federal law, and instead applied an ad-hoc test drawn from policy arguments and inapplicable cases. Courts must follow what the law *is*, not what they *wish* the law to be.

This Court granted this permissive interlocutory appeal for good reason. This Court should reverse the district court's orders certifying an FLSA collective action and ordering Cenikor to violate patient confidentiality.

## Statement Of The Case

I. **Cenikor provided a drug treatment program that used work as part of its therapeutic approach.**

A. **Cenikor provided a long-term residential drug-treatment program at little or no cost.**

Cenikor provides drug treatment for people who might not be able to find help anywhere else. Specifically, Cenikor is a Section 501(c)(3) nonprofit that helps individuals struggling with alcohol and drug addiction and/or behavioral health issues. ROA.1740. It is headquartered in Houston, Texas,

and has facilities throughout Texas and (during the relevant time) in Baton Rouge, Louisiana. *See* ROA.38. One of Cenikor's most successful sobriety programs was its adult long-term inpatient treatment program—the program at issue in this lawsuit. ROA.1740. (Cenikor no longer offers this program. ROA.2262-64.)

Many of Cenikor's long-term patients received treatment for free or at a reduced rate based on indigency or other life circumstances, while others paid a modest amount up-front. ROA.1741; *see also* ROA.1790; ROA.1821; ROA.1852-53. Whether they paid something or nothing at all, all of Cenikor's long-term patients received access to room, board, food, clothing, security, counseling, transportation, and medical care for their entire time at Cenikor. ROA.1741. Cenikor provided patients with the resources they need to earn their GED, obtain vocational training, or earn college credits toward a degree. *Id*.

Cenikor's patients are free to leave at any time, and some Plaintiffs testified about the reasons why they chose to leave Cenikor before graduating. ROA.1741; ROA.1748; *see also* ROA.1782; ROA.1920-21. But in order to graduate Cenikor's program, patients had to demonstrate they had become sober, developed a sobriety plan for the future, opened a bank

account, obtained employment with a third party, secured a reliable mode of transportation, and found a permanent residence. ROA.1807.

### B. The Therapeutic Community model applies a strict regimen that recognizes patients must learn to work in order to overcome substance abuse.

Cenikor built its long-term inpatient treatment program on the Therapeutic Community model. ROA.1740; ROA.1751-65. This model has been recognized by the U.S. Department of Health and Human Services and is used in more than 65 countries around the world to combat substance abuse. ROA.1751-65.[2]

As explained by the National Institute of Health, the Therapeutic Community model uses a "highly regulated regimen with clearly stated expectations for behavior and psychological and behavioral rewards." ROA.1754. This is because "substance abuse disorders often erode social functioning, educational/vocational skills, and positive community and family ties." *Id*. Therapeutic Communities emphasize "community as method," in which residents help each other gain these life skills by acting as role models for "right living" and providing specific feedback when peers

---

[2]    *Available at*  https://nida.nih.gov/publications/research-reports/therapeutic-communities/what-are-therapeutic-communities (visited October 24, 2022).

engage in improper behavior. *Id*. For this reason, a Therapeutic Community's highly-regulated routine includes "morning and evening house meetings, job assignments, group sessions, seminars, personal time, recreation, and individual counseling." *Id*.

Most critically for this lawsuit, "[w]ork is a distinct component of the TC [Therapeutic Community] approach." ROA.1754. "Each participant is assigned particular tasks or jobs that help teach responsibility and the importance of work, respect, and self-reliance." *Id*.

### C. Cenikor used the Therapeutic Community work model, and made absolutely clear that patients are not "employees" and would not receive wages.

Cenikor's program was consistent with the Therapeutic Community model. ROA.1740; ROA.1747; ROA.1887. Following that model, Cenikor's program had three phases: orientation, primary treatment, and re-entry. ROA.1740; ROA.1745; ROA.1755.

#### 1. *Orientation introduces patients to the therapeutic community.*

The orientation phase lasted up to sixty days, and during that phase patients learned the rules of the program, participated in group and individual therapy, and worked with counselors to develop an individualized treatment program. ROA.1740; ROA.1745. During this phase,

patients did not participate in vocational therapy. ROA.1740. Nevertheless, patients received "all basic personal needs including housing, food, emergency medical care, and clothing." ROA.1740; ROA.1747; ROA.1821-22.

**2.    *Primary Treatment introduces work as therapy, but clearly states that patients are not "employees" and will not receive wages.***

During the primary treatment phase, patients live and work together as a "family" that is "unified by their treatment needs." ROA.1744. This phase is when Cenikor adds vocational therapy and training to the patients' program. ROA.1740. Counselors work with patients to identify types of work that they would find useful, and patients must engage in vocational therapy either in Cenikor's own facility or with one of the community businesses that partners with Cenikor. ROA.1740; ROA.1747.

Cenikor plainly explains that work is an integral part of therapy. Every patient (including Plaintiffs) signs a form explaining that Cenikor's "comprehensive therapeutic treatment program includes work assignments as a part of rehabilitation," so each patient would develop a Vocational Services Plan and then receive "a job responsibility within the facility or with a community business partner." ROA.1744. Cenikor explains that "[w]ork

assignments provide each resident with a work ethic and vocational skills."
*Id*.

Importantly, these forms ensure that patients cannot mistake their vocational therapy for a job that pays wages. "Residents receive no monetary compensation for assigned responsibilities in the facility, or any on-the-job training during the primary treatment phase." ROA.1744. Patients sign papers that reiterate this point a second and a third time: "I will receive no compensation for my assigned responsibilities." ROA.1747; ROA.1749.

Patients also know they are not "employees." By signing the forms, every Cenikor patient attests that "I further understand that under no circumstances can Cenikor be under any obligation to me; that I am a beneficiary and not an employee." ROA.1747. Cenikor took this sentence (and other language) from a published opinion that held that a patient in a Salvation Army alcohol-rehabilitation program was not an "employee" for purposes of the FLSA because (*inter alia*) he signed a statement with these exact words. *Williams v. Strickland*, 87 F.3d 1064, 1065, 1067 (9th Cir. 1996); *see also infra* Argument (discussing many circuit court decisions reaching the same conclusion).

Moreover, all patients attest that they understand that any funds paid by Cenikor's community business partners related to their work will "go directly back to the Foundation to help offset the cost of treatment services." ROA.1744; ROA.1747; ROA.1749. Cenikor partially funded its program through these payments, but they merely "offset" the much greater cost of the patient's rehabilitation, which Cenikor funded mostly through private charitable donations. ROA.1741; ROA.1744; ROA.1747; ROA.1749. Cenikor also required patients to apply for government assistance like Medicaid and food stamps (if eligible) and assign those benefits to Cenikor to offset the program's costs. ROA.1825-26; ROA.1849.

### 3.     *Reentry transitions the patients back into the community.*

In the third and final phase of Cenikor's program, Cenikor helps patients reenter the community. ROA.1740-41. Patients must find full-time employment and arrange for a future permanent residence and reliable transportation so they can leave Cenikor and enjoy a stable, sober life. *See, e.g.*, ROA.1807; ROA.1890-91. Once patients obtain employment during this transitional phase, they receive wages directly from the full-time employer that elects to hire them; however, there is no guarantee that this employer

23

will continue the employment relationship after graduation. *See, e.g.,* ROA.1920-21.

### D.    Every Cenikor patient has a different story.

Every human has a different story, and that is especially true for the patients who attended Cenikor's program. For example, two Plaintiffs testified they graduated from the program in 2010 and 2011, and achieved the longest period of sobriety in their adult lives, but unfortunately relapsed and reenrolled with Cenikor in 2017 and 2018. ROA.1783-84; ROA.1790; ROA.1801; ROA.1808-09. This is particularly relevant because they testified that they knew from their prior experience at Cenikor that they would not be paid wages for their vocational therapy during the primary treatment phase. ROA.1833-34, ROA.1837-38; ROA.1780. Yet they chose to re-enroll.

Likewise, no two patients have the same motivations for entering Cenikor. Some were referred by a criminal court that gave them the option to complete Cenikor's program as a condition of probation or plea-bargain for a drug or alcohol-related crime. ROA.1811-14; ROA.1876-77. Others enrolled without court involvement. ROA.1854-55; ROA.1879.

During the orientation phase, patients meet with licensed counselors to explain their motivations for attending Cenikor, their greatest areas of

need, and their personal preferences for what they would like to receive from the treatment program. ROA.1925-31. Some patients are focused single-mindedly on getting sober, while others also seek to restore family relationships, develop new strategies to avoid circumstances that trigger relapse, regain custody of a child, or even just have criminal charges dismissed. *See, e.g.*, *id.*

In another example of differing experiences and expectations, the Plaintiffs gave widely varying answers when asked whether they thought they would be paid wages for the vocational therapy they performed during the primary treatment phase:

- Two Plaintiffs testified they already knew from their prior stay at Cenikor that they would not be paid any compensation for their vocational therapy. ROA.1780; ROA.1793; ROA.1874-75.

- One Plaintiff testified that he thought he would receive wages after he worked some number of hours. ROA.1894-98. He also testified he was never paid wages either of the two times he was in Cenikor's program. *Id.*

- Another Plaintiff testified that an unidentified individual told him that some portion of his wages would be set aside for him until the

reentry phase, though he could not remember any details. ROA.1992, ROA.1994-95, ROA.2013-19.

- Yet another Plaintiff testified he felt that room and board was his compensation for his work during the primary phase, though he admitted he received room and board even when he was not working. ROA.1882-83. Other Plaintiffs testified they were never told they had to work to eat, and confirmed they received room and board even during the orientation phase when no vocational therapy was required, or when working within Cenikor's facility instead of for a third-party company. *See, e.g.*, ROA.1979-82, ROA.1987-88.

## II.    Plaintiffs filed FLSA collective action lawsuits against Cenikor for failure to pay them wages as "employees."

### A.    Plaintiffs filed six different lawsuits against Cenikor.

Plaintiffs filed six lawsuits against Cenikor in three different federal district courts during 2019. *See, e.g.*, ROA.276. These lawsuits characterize Cenikor as a mere "staffing agency" masquerading as a drug-treatment program. ROA.276, 279. They allege that Cenikor failed to pay the FLSA-mandated minimum wage and overtime to its long-term residential patients

for the work they performed as vocational therapy for outside businesses. *Id*. Each Plaintiff framed his lawsuit as a collective action on behalf of other Cenikor patients that performed vocational therapy by working for third parties, but were not paid wages by Cenikor. *Id*.

Plaintiff Timothy Klick filed the first lawsuit in the Southern District of Texas, so all of the lawsuits were eventually transferred to that court. ROA.351. District Judge Keith Ellison then granted the parties' agreed motion to consolidate the cases with Klick's case for pretrial purposes. ROA.487. Consequently, while this interlocutory appeal arises from the Klick case, all Plaintiffs participated in discovery and most cooperated in filing the motion at issue. The named Plaintiffs are:

- <u>Timothy Klick</u>[3] and <u>Anthony Woods</u>[4] attended Cenikor's program in Fort Worth, Texas. ROA.35; ROA.276.

- <u>Shelby Williams and Randy Pouncy</u>[5] attended Cenikor's program in Beaumont, Texas. (The district court deconsolidated their cases

---

[3] SDTX No. 4:19-cv-01583.

[4] SDTX No. 4:19-cv-04569.

[5] SDTX No. 4:19-cv-02828; EDTX No. 01:19-cv-00229. *See* ROA.350.

at their request in 2021.[6])

- John Potter,[7] Malik Aleem,[8] and Wilton Chambers[9] attended Cenikor's program in Baton Rouge, Louisiana. *See* ROA.1271. (Chambers's predecessor Gregory Sorey was dismissed in November 2021 after failing to participate in discovery.[10])

In addition to these named plaintiffs, a total of 226 individuals consented to join one of these lawsuits as plaintiffs. *See* Ex. A to this Brief. This Brief uses "Plaintiffs" to refer to only the named plaintiffs in these six lawsuits.

## B. Plaintiffs sought to certify their lawsuits as collective actions under the FLSA.

### 1. *Plaintiffs moved to certify and send notice of the lawsuit to Cenikor's other patients.*

Plaintiffs moved to certify their lawsuits under the FLSA's provision for collective actions, 29 U.S.C. § 216(b), which states that an employee may sue on behalf of "other employees similarly situated." *See* ROA.2189. To address the threshold question of whether Cenikor's patients were

---

[6] ROA.25; *see* SDTX No. 4:19-cv-02828 Doc. 45, Doc. 61 (staying litigation during appeal).

[7] SDTX No. 4:19-cv-03031; MDLA No. 3:19-cv-00294. *See* ROA.351.

[8] SDTX No. 4:19-cv-03032; MDLA No. 3:19-cv-00268. *See* ROA.352.

[9] SDTX No. 4:19-cv-03033; MDLA No. 3:19-cv-00267. *See* ROA.353.

[10] *See* SDTX No. 4:19-cv-03033 Doc. 1, 110 & 10/25/21 docket entry; ROA.28 (11/25/21 docket entry).

"employees" entitled to sue under the FLSA, Plaintiffs urged the district court to apply the "economic realities test" that distinguishes independent contractors from employees. ROA.2199. Applying that test, Plaintiffs argued they were "similarly situated" to other patients in Cenikor's long-term residential program because all patients must work as part of their therapy, no patient received wages during the primary phase of the program, and all patients were dependent on Cenikor for food, shelter, and medical treatment during their treatment. ROA.2190-93.

The FLSA also gives the district court the option to send notice of the lawsuit to potential additional plaintiffs. *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430, 436 (5th Cir. 2021). Accordingly, Plaintiffs asked the district court to notify Cenikor's former patients, and to instruct the parties to negotiate about how to deal with federal privacy regulations. ROA.2189; ROA.2205-08.

> **2.**    ***Cenikor responded by challenging the legal test, the application of that test, and the propriety of sending notice that violated federal regulations.***

Cenikor responded and argued that FLSA "employee" status should not be decided by this Court's test for independent contractors, but rather by the many circuit decisions holding that plaintiffs are not FLSA

"employees" when they are volunteers, trainees, or rehab patients and thus had no expectation of compensation. ROA.2494-2507; *see also infra* Argument Section I.A. Under this test, Cenikor's patients would not be "similarly situated" because each would necessarily have a different treatment experience and a different explanation for why he or she had an "expectation of compensation" when they signed forms repeatedly stating they would not be paid for their vocational therapy. ROA.2508-11.

Cenikor also pointed out that the patients would not be similarly situated in how they answered its affirmative defenses under the Motor Carrier Act (affecting calculation of overtime), the *Rooker-Feldman* doctrine (affecting plaintiffs who attended Cenikor's program as part of a state-court criminal proceeding),[11] and how FLSA offsets for weekly benefits and wages would be calculated for each person. ROA.1692-93; ROA.2511-13. *See also infra* Argument Section I.B.

Cenikor objected to optional notice, protesting that federal regulations governing drug rehabilitation facilities prohibited it from providing any

---

[11] The trial court denied Cenikor's motion to dismiss some complaints under the *Rooker-Feldman* doctrine. *See* ROA.19 (12/17/20 docket entry); ROA.21 (2/9/21 docket entry); ROA.813; ROA.834.

identifying information about its former patients to Plaintiffs without those patients' prior consent. ROA.2513-18. Moreover, Cenikor argued that Plaintiffs had not shown the elements and proof necessary for a court to overcome the presumption of privacy and order the disclosure or use of such information. *Id*. *See also* Argument Section II.

> **C.    The district court certified the collective action, and eventually ordered that Cenikor must identify its former patients.**

On April 6, 2022, the district court granted the motion to certify and ordered that it would send notice. ROA.1452.

To determine FLSA "employee" status, the court declared it would use the "economic realities" test for independent contractors, noting that this Court had never "endorsed" other circuits' tests "in the context of rehabilitation services." ROA.1462-65. The court held it would not consider an individual's expectation of compensation as part of this test because that was a subjective belief instead of an objective economic reality—but elsewhere found that the employees expected to receive compensation in the form of in-kind services. ROA.1462, ROA.1465. The court then held that Cenikor's patients were similarly situated in applying this "economic

realities" test, both as to Plaintiffs' FLSA claims and Cenikor's defenses. ROA.1464-67.

The district court also rejected Cenikor's privacy concerns, holding that even if federal law expressly protected identifying information about Cenikor's former patients, it was not in the nature of "medical records or similarly intrusive information." ROA.1468. Moreover, it reasoned, the patients waived these protections by signing authorizations for Cenikor to contact them for follow-up on their treatment. *Id*. The court also reasoned it would "be more sensible" to send notice to potential plaintiffs than to strictly enforce the statute's requirement that those patients receive prior notice and an opportunity to object to this use of their personal information. ROA.1470. The court ordered the parties to meet and confer "on notice procedures that would adequately safeguard the privacy of program participants." *Id*. The parties reported that they could not reach agreement on notice procedures. ROA.1478-1517.

### D. The district court clarified how notice would be given, and certified its certification and notice decisions for immediate interlocutory appeal.

Cenikor asked the district court to certify its certification and notice orders for immediate interlocutory appeal to this Court pursuant to 28 U.S.C.

§ 1292. ROA.2541; ROA.1525; ROA.2578. The court agreed, entered an order making the necessary findings for a permissive appeal, and clarified that "Defendants are required to use or provide putative class members' contact information for notice purposes." ROA.1567. On August 19, 2022, this Court also granted its permission for Cenikor to pursue this permissive interlocutory appeal. ROA.1572.

<u>**Summary of the Argument**</u>

**I.    This Court should reverse the district court's certification decision.**

The district court applied the wrong legal standard to determine whether Cenikor's patients are FLSA "employees." The Supreme Court has long held that a person is not an "employee" when he works without expectation of compensation and for his own purposes. The circuit courts have unanimously held that drug rehabilitation patients like the Plaintiffs are not "employees" under this test. Patients agree they will not be paid wages, they receive benefits regardless of whether they work, and the purpose of their work is to recover from substance abuse. The district court rejected these cases and instead applied the inapposite test for independent contractors. The correct test compels the conclusion that the Plaintiffs are not employees in the first place, nor are they "similarly situated." The record

shows that all of Cenikor's patients will have different expectations of payment and what they hoped to obtain from their treatment at Cenikor.

The district court also handled Cenikor's defenses in a way that violated this Court's recent *Swales* decision. Wrongly placing the burden of proof on Cenikor, it either disregarded relevant evidence for spurious reasons or announced it would consider those defenses at a later date. Cenikor's defenses must be considered, and they provide additional proof that individualized issues prevent certification of a collective action.

## II. The district court violated federal privacy laws by ordering disclosure and use of patient identifying information.

The district court also erred when it ordered Cenikor to provide contact information for its current and former patients so that Plaintiffs could send notice of their lawsuits. Federal privacy laws strictly forbid disclosure and use of such information unless and until a court makes specific findings to support "good cause" under the statute. The district court omitted some of the mandatory findings, and replaced them with its own balancing of policy concerns for Congress's strict system. Courts may not choose which laws they will enforce, and the enacted laws prevent disclosure of patient information. "Good cause" does not exist on these facts,

and the *optional* notice allowed in FLSA collective action cases must yield to the *mandatory* requirements of federal law.

## Argument

**I.    This Court should explain the proper test for whether rehab patients are FLSA "employees," and reverse the district court's order certifying Plaintiffs' claims as an FLSA collective action.**

Plaintiffs may only pursue an FLSA collective action if the potential members of the collective are "similarly situated"—"a phrase that § 216(b) of the FLSA leaves undefined." 29 U.S.C. § 216(b); *Swales,* 985 F.3d at 433. Nearly two years ago, this Court held in *Swales* that district courts should "rigorously enforce the FLSA's similarity requirement" at the outset of litigation, *before* notice is sent to potential opt-ins. *Id*. at 443. *Swales* imposes a gatekeeping framework for assessing "whether putative plaintiffs are similarly situated—not abstractly but actually." *Id*. at 433. Courts must "rigorously scrutinize the realm of 'similarly situated' workers" with respect to all facts and legal considerations material to determining "similarly situated" status, including merits questions. *Id*. at 434, 441-42.

*Swales* explains that merits questions include dispositive threshold issues—like whether the Plaintiffs and potential collective are FLSA "employees"—because notice can only be sent to actual potential plaintiffs.

*Id*. at 440-42. Additionally, Cenikor's asserted defenses are material to determining "similarly situated" status, because courts must examine *all* available evidence to determine whether merits questions can be answered collectively. *Id*. at 441-42. Plaintiffs bear the burden of proving the collective is "similarly situated," both on the threshold question of FLSA "employee" status and with regard to Cenikor's defenses. *Id*. at 442-43.

*Swales* observed that "the individualized nature of the economic-realities test is why misclassification cases rarely make it to trial on a collective basis." *Id*. at 442. Here too, Plaintiffs' arguments necessarily devolve into individualized inquiries about each potential member of the collective. The district court held otherwise because it made two errors: (A) it applied the wrong legal test for FLSA "employee" status and thus wrongly concluded that the issue could be decided collectively; and (B) it misapplied the *Swales* procedures to Cenikor's defenses.

### A.    "Economic reality" requires the court to assess each plaintiff's expectation of compensation and the principal purpose of the relationship.

FLSA "employee" status depends on a principle the Supreme Court recognized seventy-five years ago: "An individual who, '*without promise or expectation of compensation*, but solely for his *personal purpose or pleasure*,

worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the [FLSA]." *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)) (emphasis added). This threshold "test of employment under the [FLSA] is one of 'economic reality'" and "does not depend on [] isolated factors, but rather upon the circumstances of the whole activity." *Id.* at 301 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

To examine the "economic reality … of the whole activity," courts consider whether the circumstances reflect a traditional understanding of employment or a "relationship[] [that has] deviated from the traditional understanding of employment in fundamental ways." *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 451 (4th Cir. 2021). For example, this Court held the FLSA does not apply to work performed by detainees because they are outside the normal employment relationship. *Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990); *see also Ndambi et. al v. Core Civic, Inc.*, 990 F.3d 369, 372-74 (4th Cir. 2021) (FLSA protects those who operate within "the traditional employment paradigm" but not in detainee relationship).

This section will show that where there is no traditional employment relationship—as here—courts analyze (i) whether the individual performed work with the promise or expectation that compensation would be provided *in exchange for* such work, and (ii) the principal purpose of the relationship, including whether the work was performed "not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training." *Armento*, 856 F. App'x at 453; *see infra*. Both require individual inquiries that defeat collective action.

The district court did not apply this test because it confused the duty to examine the "economic reality … of the whole activity" with the similarly named, but distinct, "economic realities test." ROA.1462-65. Courts typically apply the latter test in independent contractor misclassification cases where the individual has indisputably performed services in exchange for a monetary payment, but it does not apply here. That inapplicable test led the district court into error when applied to drug-rehabilitation patients, because the result contradicts the Supreme Court's holding that the FLSA was "obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for

their own advantage on the premises of another."[12] *Walling*, 330 U.S. 148, 153.

> **1.    The proper test considers the promise or expectation of compensation in exchange for work, and Cenikor's patients receive benefits even if they do not work.**

The Supreme Court recognized that a person's expectation of compensation will govern the threshold question of FLSA "employee" status, when it affirmed a finding that members of a religious group were FLSA "employees" because they knew they had to work *in exchange for* their room and board.

In *Alamo*, associates of a religious foundation (which the district court described as a sort of "commune") worked for no wages at various "ordinary commercial businesses" owned, operated, and/or controlled by the Tony and Susan Alamo Foundation. *Alamo*, 471 U.S. at 295; *Donovan v. Tony and Susan Alamo Foundation*, 567 F. Supp. 556, 561, 563 (W.D. Ark. 1982).[13] The

---

[12] Even if the "economic realities test" were proper, its correct application still precludes a finding that FLSA "employee" status could be collectively decided. *Compare Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379-87 (5th Cir. 2019) (applying standard and holding plaintiffs were not FLSA "employees"); *Swales*, 985 F.3d at 442 (recognizing that "the individualized nature of the economics-realities test is why misclassification cases rarely make it to trial on a collective basis").

[13] *Modified*, No. CIV. 77-2183, 1983 WL 1982 (W.D. Ark. Feb. 7, 1983).

associates knew they would not be paid cash wages for these otherwise ordinary jobs. *Donovan*, 567 F. Supp. at 574. But the district court found as a question of fact (after weighing individual testimony in 155 affidavits) that the associates nevertheless expected to be paid in-kind benefits—"wages in another form"—"*as a result of*" their work at the commercial businesses. *Id.* at 562 (emphasis added). The district court reached this conclusion in part because it found the associates received all of their worldly needs from the Foundation and were "entirely dependent on the Foundation for long periods, in some cases several years." *Id.*

In holding this finding of a quid-pro-quo relationship was not "clearly erroneous," the Supreme Court recognized that "former associates … testified that they had been 'fined' heavily for poor job performance, worked on a 'commission' basis, and were prohibited from obtaining food from the cafeteria if they were absent from work—even if the absence was due to illness or inclement weather. *Alamo*, 471 U.S. at 301 & n. 22. Moreover, the associates testified they "went out and [] worked for" the benefits they received from the Foundation, and if they did not, those benefits were reduced. *Id.*

*Alamo* does not hold that receipt of in-kind benefits *always* makes a drug-rehabilitation patient an "employee," as the district court found here. ROA.1462-63. Mere receipt of benefits does not establish that they were provided *in exchange for* services performed, which is what would convert a mere Habitat for Humanity volunteer, substance-abuse patient, or church member into a traditional "employee" working at a job. *See supra*. This conclusion was further confirmed by regulations governing volunteers that were issued after *Alamo*. 29 C.F.R. § 553.106. Those regulations expressly state that volunteers can receive benefits without losing their volunteer status. *Id*. And other circuit courts have examined *Alamo* and reached the same result. *See infra*.

Here, Cenikor indisputably did not pay Plaintiffs wages. But the district court found that Cenikor's long-term patients expected to receive benefits (i.e., "wages in another form") as a form of compensation for their work. ROA.1462-63. In order to constitute compensation for FLSA "employee" classification, however, such benefits must have been provided *in exchange for* the work performed. *Alamo*, 471 U.S. at 301 & n. 22; 29 C.F.R. § 553.106. The record shows that Cenikor's patients do not meet this standard.

Unlike the *Alamo* "commune," Cenikor is a licensed rehabilitation provider and provides its patients with food, clothing, shelter, medical care, counseling, and all other services and benefits *regardless* of whether they performed vocational services for outside businesses. Consider:

- All Plaintiffs testified they received food, housing, clothing, and counseling during the orientation phase of Cenikor's program, when they do not perform vocational therapy.[14]

- Other individuals received benefits even though they left the program before the primary phase.[15]

- Certain Plaintiffs admitted they continued to receive these benefits when illness or injury prevented them from participating in vocational services.[16]

---

[14]  *See* ROA.1872-73; ROA.1791; ROA.1847-48; ROA.1982-83; ROA.1987; ROA.1821-23; ROA.1865; ROA.1996; ROA.1901-02.

[15]  ROA.1791; ROA.1863; ROA.1903.

[16]  ROA.1880-83 (received benefits while out for back injury); ROA.1982; ROA.1987 (received benefits when injured or hurt and couldn't work); ROA.2007-11 (received benefits when out for various medical issues); ROA.1908-09 (permitted to take off work for 8 weeks due to injury).

- When patients held in-house roles at Cenikor—for which Plaintiffs do not seek compensation—they received the same benefits.[17]

These circumstances and testimony demonstrate that Cenikor merely provides benefits to program participants as a part of being in the treatment program—not *in exchange for* vocational services.[18] Indeed, as a licensed facility, state regulations require Cenikor and other inpatient providers of "rehabilitation services" to provide these benefits to their patients. *See generally* TEX. ADM. CODE Chapter 448 & § 448.1102; LA. ADM. CODE tit. 48 & § I-5669.

This Court should correct the district court's erroneous refusal to enforce the *Alamo* requirement that benefits only create an FLSA "employee" if provided *in exchange for* labor. *See supra. Swales* required the district court to rigorously scrutinize the merits, *Swales*, 985 F.3d at 434, 442, but the court instead ignored relevant evidence demonstrating the "economic reality" that participants received benefits regardless of whether they worked. The district court's legal error also violates *Swales* by prematurely deciding the

---

[17] ROA.1986-88.

[18] ROA.1824-25.

merits of Plaintiffs' case—employee status—at the certification stage. *Id*. at 440 (district courts must "ensur[e] that notice goes out to those who are 'similarly situated,' in a way that scrupulously avoids endorsing the merits of the case").

> **2.      *Cenikor's form adopts the very language that the Ninth Circuit held did not create an express or implied expectation of in-kind benefits.***

Cenikor consciously based its long-term residential program on prior legal decisions enforcing the effects of signed disclaimers.

In *Williams v. Strickland*, the Ninth Circuit held a participant in a drug rehabilitation program was not an "employee" of the Salvation Army where he signed an agreement that he would not be paid and agreed to turn over his public benefits to the Salvation Army to offset the cost of his treatment. *Williams*, 87 F.3d at 1064-67.[19] Williams signed an agreement stating that admission into the program was dependent on "the voluntary performance of such duties as may be assigned to [him]." *Id*. Under these circumstances, the court held that there was no express or implied agreement that benefits

---

[19] *See also Lafley v. SeaDruNar Recycling, L.L.C.*, 138 Wash. App. 1047, at *1-4 (2007) (unpublished) (holding former drug and alcohol clients who worked as part of non-profit drug treatment program were not employees under Washington's Minimum Wage Act because work therapy was an integral part of rehabilitation and participants signed intake paperwork that explained they were unpaid volunteers only).

were provided to him in exchange for services, but rather his work was "solely" rehabilitative and "was performed to give him a sense of self-worth, accomplishment, and enabled him to overcome his drinking problems and reenter the economic marketplace." *Id*. at 1067-68.

Cenikor modeled its written agreements and patient disclosures on the signed agreement in *Williams*. *Compare id*. with ROA.1747. Like *Williams*, Cenikor also requires participants to apply for and assign public assistance to help offset treatment costs, and participants must attest that they need drug treatment and will voluntarily perform their duties. *Compare* ROA.1747-48 *with Williams*, 87 F.3d at 1065.[20] These facts distinguish this case (and *Williams*) from *Alamo*'s finding of "employee" status.

Yet the district court held that "Cenikor's Consent for Services agreement confirms that program participants agree to work for commercial businesses and individuals, and in exchange, expect Cenikor to provide them with in-kind benefits.…" ROA.1462-63. The consent form does not state that such benefits are provided "in exchange for" work, and Cenikor

---

[20] *See also* ROA.1849; ROA.1873; ROA.1825-26; ROA.1901-02; *cf. Donovan*, 567 F. Supp. at 562 (Alamo Foundation did not solicit public contributions but instead relied on funds raised from the operation of its commercial businesses and donations from its associates).

has shown that there is no such relationship. ROA.1747; *see supra*.[21]
Accordingly, the district court's analysis directly contradicts *Williams*.
*Williams*, 87 F.3d at 1067-68. This Court should follow *Williams* instead of a
misreading of the record.

### 3. Other courts have held that expectation of compensation is a necessary threshold inquiry, whereas the district court held it is "irrelevant."

The district court's analysis also defies the Sixth Circuit's
interpretation of *Alamo*. In *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761 (6th
Cir. 2018), the Sixth Circuit applied the *Walling/Alamo* expectation-of-
compensation standard as a threshold inquiry that must be satisfied before
assessing the economic reality of the working relationship.

In *Acosta*, the DOL claimed church members should have been
considered "employees" of the church-run, for-profit restaurant where they
volunteered. *Id*. at 763. Because volunteers performed many of the same
duties as the restaurant's paid employees and felt spiritually coerced, the
DOL and the district court held the volunteers were FLSA "employees." *Id*.

---

[21] *See also Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 273 (5th Cir. 1982) (applying older
version of primary beneficiary test and holding trainees were not employees, despite
receiving housing, food, and training benefits).

at 764. But the Sixth Circuit reversed and held the volunteers could not be FLSA employees under *Alamo* because they had no expectation of compensation. *Id*. at 766-67. The usual "economic realities" test did not apply because "a volunteer's expectation of compensation is a threshold inquiry that must be satisfied" before proceeding further with the FLSA analysis. *Id*. at 766 (citing *Alamo*, 471 U.S. at 301-02).

Instead of examining the expectation of compensation, the district court held that "differences in Plaintiffs' deposition testimonies as to whether and how they thought they should have been paid" are "irrelevant" because *Alamo* looks only to "economic reality" and not "subjective beliefs." ROA.1464-65. These differences *are* the economic reality that distinguishes volunteers and patients from employees. As *Acosta* explains, expectation of compensation guides this threshold question, as well as whether their answers will be so similar that they are "similarly situated" for purposes of an FLSA collective action. *Id*. at 766-67. And this Court explained that a trainee's written acknowledgement that "he or she is not an employee during training" was material "insofar as it shows the expectations of trainees," and ultimately held those trainees were not FLSA "employees." *Donovan*, 686 F.2d at 269 & n.3, 271-72.

### 4. *In addition to expectation of compensation, the proper test considers the principal purpose of the relationship.*

Outside of the traditional employment paradigm, circuit courts analyze not only the individual's expectation of compensation (as in *Alamo*, *Williams*, and *Acosta*), but also the principal purpose of the relationship— such as when the labor was performed for that individual's own benefit.[22] These courts "have deemed it appropriate to examine who is the 'primary beneficiary' of an arrangement between parties in a potential employer-employee relationship," as with interns, students, and patients. *Fochtman v. Hendren Plastics, Inc.*, 47 F.4th 638, 645 (8th Cir. 2022) (citing *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536 (2d Cir. 2016) (applying a version of "primary beneficiary" analysis to the "intern" context).[23]

In addition to the Ninth Circuit in *Williams*, the three other circuit courts that addressed FLSA "employee" status in the context of a drug rehabilitation program involving vocational work therapy—the Second,

---

[22] *See, e.g.*, *Harker v. State Use Indus.*, 990 F.2d 131, 133 (4th Cir. 1993) (inmates performed labor "not to turn profits for supposed employer, but rather as a means of rehabilitation and job training"); *Acosta*, 887 F.3d at 768 (even though Cathedral Buffet was organized to turn a profit, "what matters is not the object of the enterprise, but instead the purpose of the worker").

[23] *See also Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518 (6th Cir. 2011) (student); *Isaacson v. Penn Cmty. Servs., Inc.*, 450 F.2d 1306, 1309-10 (4th Cir. 1971) (conscientious objector); *Donovan*, 686 F.2d at 273 (intern).

Fourth, and Eighth—analyzed *both* expectation of compensation *and* the principal purpose of the relationship in some form. This Court should adopt these circuits' sensible approaches, and hold they require reversal.

> i. <u>*Vaughn* reasoned that drug-rehab patients, like interns, were the primary beneficiaries of the relationship.</u>

In *Vaughn v. Phoenix House Found., Inc.*, 957 F.3d 141 (2d Cir. 2020), the Second Circuit analogized to "interns" when it affirmed the dismissal of an FLSA claim brought by a patient in a residential substance abuse program. *Id.* at 144. In *Vaughn*, the district court found that "the purpose of [Vaughn's] relationship with Phoenix House was solely rehabilitative and at no point was there an express or implied agreement for compensation" for the work he performed as therapy. No. 14-CV-3918 (RA), 2019 WL 568012, at *6 (S.D.N.Y. Feb. 12, 2019). The Second Circuit agreed, and found useful precedent in its cases addressing whether "unpaid intern[s]" were the "primary beneficiary" of the alleged employment relationship. 957 F.3d at 145. The key factor was Vaughn's knowledge that he would not be paid, and would not be entitled to paid employment after the program ended. *Id.* at 145-46.

Moreover, the Second Circuit reiterated that Vaughn "is not an intern, but a recipient of in-patient treatment in a court-approved rehabilitation program." *Id.* at 146. The "significant benefits" Vaughn received — "food, a place to live, therapy, vocational training, and jobs that kept him busy and off drugs" — were not the fruits of an implied compensation agreement, but rather were provided so that he could receive rehabilitation treatment in lieu of a jail sentence. *Id.*

      ii.     *Fochtman* found that "drug offenders" were the primary beneficiaries of a court-order rehab program.

Likewise, in *Fochtman*, the Eighth Circuit recently affirmed summary judgment against participants in a court-ordered drug and alcohol recovery program who brought a state class action suit for failure to pay minimum wage and overtime against the non-profit program organizer ("DARP") and the for-profit businesses for which they performed work.

In *Fochtman*, most of the class members were "drug offenders" referred to DARP through state drug court programs. 47 F.4th at 642. Finding guidance in FLSA cases, *Fochtman* held the participants were not "employees" of either DARP or the for-profit businesses. *Id.* at 644, 646. The court held that the participants were "the primary beneficiaries of the

arrangement," reasoning they undertook the recovery program for *their own purposes*—to avoid imprisonment. *Id.* at 646. It also held there was no implied agreement for compensation because DARP's "provision of sustenance was not in-kind compensation for work performed," but rather, the participants were guaranteed room, board, and basic necessities as an element of the program. *Id.*

> iii.    *Armento* held that veterans were the primary beneficiaries of a rehabilitation and training program.

In *Armento*, the Fourth Circuit reached the same conclusion when it held that a resident of a transitional housing program for male veterans was not an employee under the North Carolina Wage and Hour Act ("NCWHA"). 856 F. App'x at 452-53. Again looking to FLSA law for guidance, the Fourth Circuit "emphasized the relationship's primary purpose as an important factor" in determining that Armento was the "primary beneficiary" of the program and was *not* an "employee" under the NCWHA. *Id.*

The court reasoned that Armento and the other residents "performed service hours 'not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training.'" *Id.* at 453 (quoting *Harker*, 990

F.2d at 133). Additionally, the court found that Armento neither expected nor received compensation because the residents received free room and board merely in exchange for complying with the program's policies, including the generally mandatory policy that they participate in work rehabilitation. *Id.* at 454.

In reaching its decision, the Fourth Circuit analyzed *Alamo* and *Walling* and rejected the "economic realities" test used by the district court in this case. *Id.* at 451-53; *compare* ROA.1464. *See also Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (listing the factors of this test). The Fourth Circuit recognized this test has "little relevance" when "the plaintiff is indisputably not an independent contractor." *Id.* (quoting *Steelman v. Hirsch*, 473 F.3d 124, 129 n.1 (4th Cir. 2007)).

*Armento*'s rejection of the traditional "economic realities" test makes particular sense in the drug rehabilitation context. The traditional test's elements of "opportunity for profit or loss" or "relative investment in the business facilities" become irrelevant when the individual knowingly agrees to participate in licensed rehabilitation and has no expectation of being paid. Because the multi-factor independent contractor test "is of limited utility in determining whether an individual is an employee, as opposed to a

volunteer," the Fourth Circuit stayed faithful to the Supreme Court and used the "totality of the circumstances" analysis. *Id*. at 453.

iv.    <u>This Court should adopt these courts' analyses.</u>

The district court rejected the primary beneficiary test in this case because it "has not been endorsed by the Fifth Circuit in the context of rehabilitation services." ROA.1465. But this Court *did* adopt an earlier version of the primary beneficiary test in other contexts and held no employment relationship existed. *Donovan*, 686 F.2d at 273. Moreover, this Court is free to do what the district court felt it could not—adopt the well-reasoned approach of the other circuit courts (and its own) and extend it to the drug rehabilitation patients in this case.

Notably, Plaintiffs cannot cite *any* circuit court case in support of their arguments. Plaintiffs relied instead on two district court decisions. ROA.1460. However, the Eighth Circuit recently reversed the first decision in *Fochtman*, soundly defeating the Plaintiffs' argument. *See supra*. The second district court opinion, *T.S. v. The Burke Foundation*, 521 F. Supp. 3d 691 (W.D. Tex. Feb. 22, 2021), held that the court could collectively determine the FLSA employment status of minor boys who worked while attending a residential treatment center for "severe emotional or mental-health issues."

*Id*. In that case, the only difference between the plaintiffs was the number of hours they worked, which had no effect on whether they were FLSA "employees." *Id*. at 697. This case presents many more differences between the plaintiffs. *See supra*. Moreover, *T.S.* did not address any of the important questions about what legal standard should be applied to determine FLSA "employee" status. *T.S.*, 521 F. Supp. 3d at 697. *T.S.* therefore provides no guidance on the issues presented in this appeal.

### 5. The primary beneficiary test requires individualized inquiries that defeat FLSA collective action because plaintiffs will not be "similarly situated."

A person's expectation of compensation and the primary beneficiary test are two perspectives that both enforce the Supreme Court's insight that "[a]n individual who, *'without promise or expectation of compensation*, but solely for his *personal purpose or pleasure*, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the [FLSA]." *Alamo*, 471 U.S. at 295 (emphasis added). The circuit courts found different ways to implement this single legal test. *See supra.*

Cenikor does not argue that this Court should *rigidly* apply each factor of the primary beneficiary test to the instant case; after all, the DOL has

recognized that the test is flexible.[24] Instead, this Court should synthesize *Williams*, *Lafley*, *Vaughn*, *Fochtman*, and *Armento*, and apply that synthesis to cases (like this one) involving rehabilitation patients who work as therapy. Cenikor believes these cases require individualized inquiries into the following non-exhaustive list of considerations:

i) <u>Personal purpose</u>. Was each participant's personal purpose to obtain employment and compensation, or was it something else—like drug and alcohol rehabilitation, developing a work ethic and job skills, or avoiding imprisonment?

ii) <u>Serving a rehabilitative purpose</u>. Did the program serve only the purpose of generating revenue through each participant's labor, or did the program serve the participants' rehabilitative purposes?

iii) <u>Meeting the participant's needs</u>. Did the program require work without accommodation, or did it accommodate other needs such as substance abuse counseling, medical treatment, education, and legal obligations?

---

[24] https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs71.pdf.

iv) <u>Duration of the program</u>. Was the program's duration limited in accordance with the participants' treatment needs, or was it never-ending?

v) <u>Expectation of employment</u>. Did each participant expect that he or she would be entitled to a guaranteed, paid job at the conclusion of the program, or did that participant expect he would have to find future employment on his own?

Whether this Court looks to a person's expectation of compensation, or this formulation of the primary-beneficiary test, the district court erred by certifying collective action in this case. The primary-beneficiary test is necessarily individualized and outcome-oriented.[25] Discovery conducted thus far demonstrates that no two patients are "similarly situated" because no two personal purposes, circumstances, experiences, or treatment programs are the same:

- Some patients admit they knew from prior attendance at Cenikor they would not be paid wages, while others had vague or mistaken

---

[25] *See Wang v. Hearst Corp.*, 203 F. Supp. 3d 344, 349-55 (S.D.N.Y. 2016), aff'd, 877 F.3d 69 (2d Cir. 2017) (examining each of six plaintiffs' individual experiences and outcomes in "intern" context, including skills each learned in program and academic credit each received for participating).

ideas about how they might be paid something, notwithstanding the intake forms that told them otherwise.[26]

- Some completed Cenikor's program as a condition of their probation or plea bargain for a drug or alcohol-related crime, while others enrolled without court involvement.[27]

- Some patients attended the orientation phase only and dropped out before ever providing vocational services to third party community business partners,[28] while others graduated and could look forward to a secure job and a stable life.[29]

- Some patients received a GED or college credits, while others did not.[30]

- Some patients work in-house at Cenikor's facility instead of for an outside business partner.[31]

---

[26]    ROA.1780; ROA.1793; ROA.1874-75; ROA.1882-83; ROA.1894-98; ROA.1992, ROA.1994-95, ROA.2013-14.

[27]  ROA.1811-14; ROA.1876-79; ROA.1854-55.

[28]  ROA.1847-48; ROA.1863-65; ROA.1903-04.

[29]  ROA.1807.

[30]  ROA.1847.

[31]  ROA.1986-88.

- Through their participation in the vocational work therapy component of the program, some patients developed work ethic, some learned entirely new job skills in their desired field, and others developed and expanded the job skills they already possessed.[32]

- Some patients also received life-saving medical care, while others did not need such care.[33]

In sum, the correct test for FLSA "employee" status accounts for each plaintiff's expectation of payment and personal purpose, and whether the patient benefited from the relationship. This Court should join the other circuits in adopting such a test. And when it applies that test to this case, it should hold that the Plaintiffs are not "similarly situated" and their claims should not be certified as an FLSA collective action.

### B. Cenikor's defenses prove that the Plaintiffs are not "similarly situated."

Second, Cenikor's defenses must be part of the certification decision, and they further demonstrate that individualized inquiries prevent the

---

[32] ROA.1980-81 (new vocational skills); ROA.1842, 1845-46 (work experience and training helped secure job); ROA.1868-69; ROA.1884 (developed electrician skills that allowed him to begin career at electric company).

[33] ROA.1975-79.

Plaintiffs and their proposed collective from being "similarly situated." The district court violated *Swales* by stating it would postpone its analysis of how those defenses impact certification in this case, and by misplacing the burden of proof. These defenses thus provide additional explanation why that the district court should have denied certification.

### 1.   *Defenses must be part of the FLSA certification analysis, and cannot be pushed aside until some later date.*

This Circuit requires district courts to determine whether a defendant's asserted defenses will necessitate individualized analysis *prior to* determining whether certification is appropriate. *Swales*, 985 F.3d at 441. *Swales* also holds it is Plaintiffs' burden to show the case can be tried collectively, even in the face of the defendant's defenses. *Id*. at 443.[34]

District courts in this Circuit have held they must deny certification when defenses require individualized inquiries.[35] Additionally, if defenses

---

[34] *See also Hebert v. TechnipFMC USA, Inc.*, No. 4:20-CV-2059, 2021 WL 1137256, at *2 (S.D. Tex. Feb. 5, 2021) ("[t]he plaintiff has the burden to establish that evidence exists").

[35] *See Fuller v. Jumpstar Enters., LLC*, No. H-20-1027, 2021 WL 5771935, at *8 (S.D. Tex. Dec. 6, 2021); *Trottier v. FieldCore Servs. Sols., LLC*, No. 2:20-CV-186-Z-BR, 2022 WL 658765, at *6 (N.D. Tex. Mar. 4, 2022) (citing *Reyes v. Tex. Ezpawn, L.P.*, No. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007)).

apply only to certain individuals, the court must deny certification.[36] That said, "whether an employe[r] argues that one defense applies to all plaintiffs is beside the point; 'the fact that an individualized inquiry will likely be necessary weighs strongly in favor of decertification,'" or in the instant case, denial of certification.[37]

The district court applied a very different legal analysis. It chose to disregard the evidence Cenikor presented with regard to each of its defenses, implicitly (and incorrectly) placing the burden of proof on Cenikor instead of Plaintiffs. ROA.1466-67. In doing so, the district court cited its own opinion in another case: "later developments in the case, pertaining to the merits of [a] defense . . . may make relevant individual differences among the members of the proposed collective that are not relevant now." *Id*.[38] This approach flatly contradicts *Swales*, because *Swales* rejected the old certify-

---

[36] *See, e.g., Rosales v. Indus. Sales & Servs., LLC*, No. 6:20-CV-00030, 2021 WL 4480747, at *9 (S.D. Tex. Sept. 30, 2021).

[37] *See Torres v. Chambers Protective Servs., Inc., et al.*, No. 5:20-CV-212-H, 2021 WL 3419705, at *7 (N.D. Tex. Aug. 5, 2021) (quoting *Clay v. New Tech Glob. Ventures, LLC*, No. 16-296-JWD-CBW, 2019 WL 1028532, at * 14 (W.D. La. Mar. 4, 2019)).

[38] *See Alvarez v. NES Glob. LLC*, No. 4:20-CV-1933, 2021 WL 3571223, at *4 (S.D. Tex. Aug. 11, 2021), reconsideration denied, 2021 WL 4593985 (Oct. 6, 2021).

now-and-reconsider-later approach that courts adopted from *Lusardi*.

*Swales*, 985 F.3d at 441.

### 2. *Cenikor's offset defense requires highly individualized inquiries that render certification improper.*

Post-*Swales* case law in this circuit demonstrates that certification is

inappropriate where complex, individualized computation will be necessary

to determine liability.[39] In this case, liability presents tremendous calculation

problems that Plaintiffs and the district court simply ignore.

Whether Cenikor violated the FLSA must be calculated plaintiff-by-

plaintiff and week-by-week. That is because Plaintiffs allege they were not

provided the minimum wage required by the FLSA, but also allege that they

expected to receive compensation in the form of room, board, and benefits.

If plaintiffs were FLSA "employees"—and they are not—Cenikor only

violated the FLSA for a given plaintiff in a given week if the value of the in-

kind compensation given was less than the minimum wage for the specific

---

[39] *See, e.g.*, *Aboin v. IZ Cash Inc.*, No. 4:20-CV-03188, 2021 WL 3616098, at *6 (S.D. Tex. June 29, 2021) (wage deduction analysis too individualized); *Marquis v. Sadeghian*, No. 4:19-CV-626-RWS-KPJ, 2021 WL 6621686, at *7 (E.D. Tex. Dec. 30, 2021) (unable to collectively determine whether compensation violated FLSA based on varying hours worked and varying types of compensation received, including housing); *Eltayeb v. Deli Mgmt., Inc.*, No. 4:20-CV-00385, 2021 WL 5907781, at *3 (E.D. Tex. Dec. 14, 2021) (complex pay structure resulted in highly individualized inquiry).

hours each individual worked. Specifically, the court must compute both sides of this equation:

(i) <u>Benefits received.</u>  In a given week, what was the value of the food, clothing, housing (which varies in value from facility to facility), counseling, medical care, vocational training and skills developed, education received, transportation, access to gym, pool, internet, and career development planning assistance provided to that patient?

(ii) <u>Hours worked.</u>  How many hours did that same patient spend in that same week providing vocational services to a community business partner? This is then multiplied by the $7.25 minimum wage.

Obviously, both parts of this equation require intensely individual analysis for each plaintiff and demonstrates the plaintiffs are not "similarly situated."

Yet the district court held that "Defendant's arguments as to damage calculations are premature at this certification stage," ROA.1467, which was error for two reasons. First, *Swales* does not allow the district court to postpone its consideration of a defense. *Swales*, 985 F.3d at 441. Second, the offset calculation is not limited to damages, as the district court erroneously assumed. This calculation determines whether Cenikor has *even violated the FLSA in the first place* on a week-by-week and plaintiff-by-plaintiff basis.

This Court should reaffirm *Swales* and hold that district courts must account for the complexity and individual nature of these calculations when deciding whether to certify a collective action, rather than leaving these calculations for later (as the district court did). ROA.1467.

### 3. *Cenikor's MCA Defense requires highly individualized inquiries that make certification improper.*

With regard to Cenikor's Motor Carrier Act defense, courts have held that the plaintiff bears the burden of showing that a proposed collective is similarly situated as to overtime-pay coverage (that the MCA does not make them exempt). *Rosales,* 2021 WL 4480747, at *9. In *Rosales*, a district court in this Circuit found it was appropriate to assume that the MCA exemption applied when asserted by the defendant, and held it was the *plaintiff's* burden to demonstrate that the application of the MCA exemption test would *not* require the court to engage in a highly individualized inquiry rendering certification inappropriate. *Id.*

Cenikor's patients participated in many types of vocational therapy and their "job duties" varied significantly. *See* ROA.1777 ("Cenikor had jobs in plants, bakeries, stores"). Two of the seven Plaintiffs deposed may be exempt from the FLSA's overtime provisions under the MCA because their

activities, in whole or in part, directly affected the safety of operation of motor vehicles in interstate commerce while performing services as "loaders." 29 C.F.R. § 782.5; *see* ROA.1913-19; ROA.2004-06. Every plaintiff must be investigated separately to determine whether this MCA exemption applies. In turn, this demonstrates that Plaintiffs and the proposed collective are not similarly situated with regard to potential overtime coverage, such that certification must be denied or the claim for overtime wages excluded.

Once again, the district court shifted the burden of proof onto Cenikor and postponed its analysis of the defense. ROA.1466-67. The court's justification fails to persuade. First, the district court reasoned that the testimony of one such potentially exempt individual "raises questions as to whether he would meet the MCA exemption." ROA.1466. But the court's perfunctory analysis was too milquetoast for *Swales*. *Swales*, 985 F.3d at 443. And even if this one individual ultimately is not exempt, he nevertheless demonstrates the need to pose the question for each proposed plaintiff.

Second, the district court then erroneously ignored the testimony of the other potentially exempt individual, reasoning that his case was deconsolidated from this one. ROA.1467. This misses the point. Even if he is not part of the consolidated cases, he nevertheless falls within the definition

of the proposed collective—and demonstrates the need for individualized

determination as to other potential putative plaintiffs.

> **4.** ***Cenikor's* Rooker-Feldman *doctrine defense requires highly individualized inquiries rendering certification improper.***

Cenikor also asserts a jurisdictional defense under the *Rooker-Feldman*

doctrine as to certain court-referred Plaintiffs. ROA.834. That doctrine

prohibits inferior federal courts from modifying or reversing state court

judgments. *Truong v. Bank of Am., N.A.*, 717 F.3d 377, 379 (5th Cir. 2013).

Here, it is undisputed that certain Plaintiffs were court-ordered to

attend and participate in Cenikor's treatment program in order to reduce

pending criminal charges or in lieu of serving additional time in prison.

ROA.1811-14; ROA.1876-79. Cenikor argued the district court did not have

jurisdiction to review those state orders compelling three of the Plaintiffs[40]

to attend Cenikor and participate in vocational therapy without pay.

ROA.834. The district court denied Cenikor's motion to dismiss, holding it

was "a close call" but not proven on the evidence provided for these

Plaintiffs. ROA.2055-56.

---

[40]   These did not include Timothy Klick, whose case gives rise to this permissive interlocutory appeal. ROA.834.

Nevertheless, when Cenikor pointed out that the same analysis must be performed for every court-referred plaintiff, the district court swept aside the necessary conclusion that these plaintiffs were not similarly situated. ROA.1467. The district court stated that Cenikor had not yet proven that other state court judgments would lead to a different conclusion, but then stated that "later developments in the case" might make those differences relevant after all. *Id.* This was error for two reasons. First, the *Rooker-Feldman* doctrine will apply the same way to each court-referred plaintiff, and it will necessarily require an individualized examination to determine whether the plaintiff's allegations contradict the terms of his state criminal court judgment and what that court understood about Cenikor's residential program. Second, as explained above, the district court violates *Swales* when it tries to defer consideration of a defense until later in the case.

## C.    Conclusion: This Court should reverse the district court's certification decision.

The district court's decision to certify a collective action was error for two separate but related reasons—(1) the plaintiffs are not "similarly situated" under the correct legal analysis; and (2) it erroneously interpreted and postponed consideration of Cenikor's defenses, which violates *Swales*.

For both reasons, this Court must reverse and instruct the court to deny collective action certification in this case.

## II.    The District Court's Certification Order Requires Cenikor Violate Federal Privacy Laws and Regulations that Protect the Identity of Substance Use Disorder Patients

If this Court declares that no collective action can be certified, as it should, it need not address the second issue. But if this Court leaves open the possibility of certification, it should address a second and *critical* problem created by the district court's certification order. Having certified a collective action, the district court ordered Cenikor to disclose the names and other identifying information of its substance abuse patients in violation of applicable federal laws. Specifically, the district court "ruled that Defendants are required to use or provide putative class members' contact information for notice purposes." ROA.1567; *see also* ROA.1468-71. This error must be reversed to protect the confidentiality that reassures Cenikor's patients that they can get the help they need.

### A.    Privacy statutes scrupulously protect substance abuse patient identifying information, including names.

Federal law prevents disclosure of records containing the identity of any patient maintained in connection with the performance of any program or activity relating to substance abuse treatment. *See* 42 U.S.C. § 290dd-2(a);

42 C.F.R. §§ 2.11-13 (often called "part 2"). Unconditional compliance with these privacy protections is required, "whether or not the part 2 program . . . believes that the person seeking the information already has it, has other means of obtaining it, is a law enforcement agency or official or other government official, has obtained a subpoena, or asserts any other justification for a disclosure or use which is not permitted by the regulations in this part." 42 C.F.R. § 2.13(b). Patient identification records and information may not be disclosed or used in any civil proceedings. *Id*. § 2.13(a).

"Patient identifying information" includes the name, address, photograph, "or similar information by which the identity of a patient . . . can be determined with reasonable accuracy, either directly or by reference to other information." *Id*. § 2.11. "Disclose," in turn, "means to communicate any information identifying a patient as being or having been diagnosed with a substance use disorder, having or having had a substance use disorder, or being or having been referred for treatment of a substance use disorder, either directly, by reference to publicly available information, or through verification of such identification by another person." *Id*. Violations

can result in criminal penalty. 42 U.S.C. § 290dd-2(f); 42 C.F.R. § 2.4. Cenikor's program comes within the scope of part 2.

These privacy protections "vigorously protect the range of records about substance abuse." *Carr v. Allegheny Health, Educ. & Research Found*, 933 F. Supp. 485, 487-88 (W.D. Pa. 1996) ("Congress recognized that absolute confidentiality is an indispensable prerequisite to successful alcoholism research")). Congress clearly stated its intent to protect patient privacy:

> The conferees wish to stress their conviction that the *strictest adherence* to the provisions of this section is *absolutely essential to the success of all drug abuse prevention programs*. Every patient and former patient must be assured that his right to privacy will be protected. Without that assurance, fear of public disclosure of drug abuse or of records that will attach for life will discourage thousands from seeking the treatment they must have if this tragic national problem is to be overcome.

H.R. Rep. No. 775, 92d Cong., 2d Sess. (1972), quoted in *Ellison v. Cocke Cty. Tenn.*, 63 F.3d 467, 472 (6th Cir. 1995) (J. Ryan, concurring) (emphasis added).

## B.    Courts may compel disclosure of protected identifying information only in narrow circumstances.

Section 290dd-2 permits disclosure of patient identifying information only: (1) with the patient's consent; (2) in a medical emergency; (3) in a limited sense for certain scientific research; or (4) if authorized by "an

appropriate order of a court." 42 U.S.C. § 290dd-2(b). Here, the district court

tried and failed to issue an "appropriate order." *Cf.* ROA.1470.

Court orders under Section 290dd-2 are allowed "only under narrow

circumstances" and must satisfy multiple requirements. *Carr*, 933 F. Supp. at

487. The party seeking disclosure must demonstrate "good cause" to the

court, including "the need to avert a substantial risk of death or serious

bodily harm." 42 U.S.C. § 290dd-2(b)(2)(C). The application for a good-cause

determination must use a fictitious name and may not disclose any patient

identifying information. 42 C.F.R. § 2.64. Moreover, the affected patients

"must be provided" notice and an opportunity to respond or appear to

testify regarding whether the court should hold that "good cause" exists for

disclosing their information. *Id.*

A court has no authority to enter an order requiring disclosure until it

makes a determination that good cause exists. *Id.* In making this

determination, the district court must weigh the public interest and the need

for disclosure against the injury to the patient, the physician-patient

relationship, and to the treatment services. 42 U.S.C. § 290dd-2(b)(2)(C).

Additionally, the district court must find (1) that other ways of obtaining the

information are not available or would not be effective; and (2) the public

interest and need for the disclosure outweigh the potential injury to the patient, the physician-patient relationship and treatment services. 42 C.F.R. § 2.64(d).

Finally, even if good cause is found, the resulting court order must limit disclosure and include measures necessary to limit disclosure and seal the information from public scrutiny. *See* 42 C.F.R. § 2.64; *see also* 42 U.S.C. § 290dd-2(b)(2)(C) (imposing restrictions that are implemented in these regulations).

## C. The district court did not comply with mandatory requirements.

The district court's orders fail these requirements at almost every required step.

### 1. *The district court is not free to rewrite the laws.*

First, the order states that "Plaintiffs do not seek medical records or similarly intrusive information regarding the proposed class members," but instead "seek only their names and contact information." ROA.1468. That is not a lawful distinction; a patient's name and contact information is itself expressly protected. 42 U.S.C. § 290dd-2(a); 42 C.F.R § 2.11.

**2.      The district court is not free to declare the law "redundant," nor could it depend on prior consent given for a different purpose.**

Second, the district court disregarded the law's mandatory process for patients to be given notice and an opportunity to be heard, holding it was "redundant" and not necessary. ROA.1470. But nothing in the statute or regulations permits a district court to pass judgment on the law itself. *See* 42 U.S.C. § 290dd-2(a); 42 C.F.R § 2.11.

As part of its analysis, the district court also concluded that Cenikor could use or disclose its former patients' contact information because "all program participants '[gave] permission to Cenikor Foundation to contact [them] via phone and/or email for all phone numbers and email addresses provided during admission and for a period of up to three (3) years following discharge in order to collect follow up data.'" ROA.1468. Those consent forms do not satisfy the privacy laws, however, because Cenikor obtained them for a narrow purpose specifically authorized by the statute, not to send notice of a possible FLSA claim. Part 2 requires Cenikor to obtain prior written consent to follow up with patients for purposes of "treatment, payment, and health care operations." 42 U.S.C § 290dd-2(b)(1)(B). Cenikor limited its consent forms to that authorized purpose—collecting data

concerning how a former patient is doing post-treatment. The form does not prove the patients gave their prior consent to disclose or use their private information for any other unanticipated purpose.

### 3. The district court did not and could not make the mandatory finding that there was no other way of obtaining the information.

Third, the order made no finding (and did not even mention) that other ways of obtaining the information are not available or would not be effective, but this finding is mandatory under 42 C.F.R. § 2.64(d).[41] This failure was no accident, because the evidence plainly shows that other ways of information-gathering are both available and effective. Following many publicized news articles and social media posts, Plaintiffs filed multiple near-simultaneous lawsuits with nearly identical claims, which ultimately resulted in 226 individuals opting into the consolidated litigation. Plaintiffs proudly admitted these facts in their own motion and pleadings. ROA.2189-90; ROA.280. Clearly, other methods are effective.

---

[41] The district court disregarded this element because it asserted that Cenikor "argues that Plaintiff has failed to discuss" two of the other elements. ROA.1470. The court apparently misunderstood when Cenikor said Plaintiffs "make an unpersuasive argument about (1) and (2) above and then completely ignore (3) and (4)." ROA.2515. Cenikor argued that Plaintiffs satisfied *none* of the four conditions, and made a particularly detailed argument about this element. ROA.2517-18.

> ### 4.  The district court made no finding of good cause, whereas the only case on point found no good cause on similar facts.

Fourth, and most importantly, the district court failed to make any specific finding of good cause—which is also mandatory under 42 C.F.R. § 2.64(d) and 42 U.S.C. § 290dd-2(b)(2)(C). The phrase "good cause" does not appear anywhere in the district court's order. ROA.1468-70.

This omission speaks volumes. The only court to have considered this precise issue—disclosure of the names of substance abuse patients in response to a wage and hour inquiry—held no good cause existed. *See In re Employment Records of John Does Employed By Sharpe Holding, Inc.*, No. 417MC238-RLW, 2017 WL 6547738 (E.D. Mo. Dec. 20, 2017) ("*Doe*"). Yet the district court ignored this highly relevant case. *See* ROA.1468-70.

The defendant in *Doe* was, like Cenikor, a nonprofit and tax-exempt corporation that provides full-time residential services to persons with behavioral and substance abuse problems. *Id.* at *1. When a former resident complained about alleged unpaid wages, the DOL requested records concerning participants other than the plaintiff. *Id.*

The Eastern District of Missouri declined the DOL's request. In doing so, the court specifically noted that substance abuse is "a sensitive matter,

particularly when the patient is admitted into a long-term residential program." *Id.* at *2. The court agreed with the defendant's claim that "work is an integral part of rehabilitation" and that "[d]isclosing the identities of participants in the Recovery Program" would destroy the confidentiality protections otherwise guaranteed. *Id.* Furthermore, as noted by the court in *Doe*, disclosure "would likely discourage those in need of substance abuse treatment from entering the Recovery Program." *Id.* (citing *U.S. ex rel. Chandler v. Cook Cty., Ill.*, 277 F.3d 969, 981 (7th Cir. 2002) ("…Patients will be less willing to seek treatment if patient confidentiality is not strictly protected.")). The potential for a wage and hour violation was not sufficient to overcome Congress's strict confidentiality protections for individuals that seek to better themselves by seeking treatment for substance abuse. *Id.* at *2.

This Court should likewise hold that the district court could not determine good cause exists to violate the privacy of the patient participants in Cenikor's drug treatment program. Put simply, Plaintiffs request an order that letters be sent to the homes, email addresses, and phone numbers of Cenikor's current and former patients. ROA.1479-81. Many of these residents likely wish to have their struggles kept confidential, and such communications could be seen by unintended parties who are unaware of

their struggles with addiction—whether family members, spouse, partners, friends, or employers and coworkers. Some of the Plaintiffs themselves testified to their desire for this secrecy. ROA.1778; ROA.1826; ROA.1904; ROA.1972. Notably, while participating in Cenikor's program, the residents are only referred to by their first names and the first letter of their last names, in an effort to maintain anonymity.

Here, sending mass notice would serve as a signal to former participants and others considering treatment that their names, too, could be publicized and their friends and family could find out about their history of substance abuse and treatment. Congress intended to prevent this very result. *Carr*, 933 F. Supp. at 487-88; *Ellison*, 63 F.3d at 472. And in this case, any balance must favor privacy. Unlike these mandatory laws, FLSA notice is *discretionary* and "must be scrupulous to respect judicial neutrality." *Swales*, 985 F.3d at 436 (quoting *Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 174 (1989)). There cannot be "good cause" to violate patient privacy in order to exercise a discretionary power—especially not on these facts.

**D.    This Court should distinguish the cases cited by the district court.**

Instead of relying on the case on point, the district court relied primarily on *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, MDL No. 2445, No. 13-MD-2445, Civ. A. No. 16-5073 (E.D. Pa. Dec. 3, 2021), *Heredia v. Tate*, No. 3:19-cv-00338-jdp (W.D. Wisc., Dec. 22, 2020), *Putnam v. Eli Lilly & Co.*, 508 F. Supp. 2d 812, 814 (C.D. Cal. 2007), and *Doe v. Meachum*, 126 F.R.D. 444, 450 (D. Conn. 1989) in determining that "Courts have ordered disclosure of records containing treatment information when privacy objections were outweighed by an interest in redressing potential violations of substantive federal law." ROA.1469. "In those cases, court [sic] have held that privacy issues can be adequately addressed through safeguards governing the disclosure of the information." *Id*.

Each case is readily distinguished. None involves a wage claim by patients in a substance abuse treatment program. None addresses the part 2 considerations at issue in this case. And none supports the district court's inexplicable decision to replace the express elements of part 2 with a balancing test based on the court's policy concerns.

In *Heredia*, the court followed the federal privacy laws, whereas here, the court sought excuses to flout it. *Heredia* analyzed constitutional challenges brought by a Rule 23 class of juvenile inmates seeking parole opportunities. *See* Order at 1.[42] In *Heredia* "notice has been provided by the regulation," whereas here, the district court refused to provide notice because he concluded it was "redundant." *Id*. at 2; ROA.1470. Additionally, the parties in *Heredia* stipulated to the form and distribution of notice to the class members. Order at 2. The files at issue were the inmates' institutional files, which may or may not have had information protected by part 2. *Id*. And the names of the class members in *Heredia* were already known, independent of any information about their possible past participation in a substance use disorder treatment program. *See id*. at 1-2.

Similarly, *In re Suboxone* was a Rule 23 antitrust class action in which the proposed class consisted of third party payer insurance companies as well as individual purchasers of a prescription drug. 2021 WL 5758896, at *1-2. The only issue was the *form* of a proposed notice that would be sent to the individuals. *Id.* Consequently, that court's only part 2 consideration was

---

[42]  The unpublished *Heredia* order in *Heredia* is Doc. 63 on its PACER docket, but is not available on Westlaw.

whether or not the form notice included measures necessary to limit disclosure and seal the information from public scrutiny. *See id.* at *5; 42 C.F.R. § 2.64. *In re Suboxone* provides that a court order could sometimes take additional steps to protect the patient names, but provides no support for the district court's attempt to issue such an order without complying with other mandatory steps (i.e., notice, opportunity to be heard, findings of good cause, or that alternate means are not available). Further, the order did not seek the individuals' history of purchasing pharmaceuticals or the reason for their purchases. *Id*.

The final two cases cited by the district court are also of no help. *Putnam v. Eli Lily* was an FLSA collective action brought by pharmaceutical *representatives*, not users of pharmaceutical products, so the identities of substance use disorder patients was not at issue. 508 F. Supp. 2d 812. And *Doe v. Meachum* pre-dates the passage of HIPAA and part 2; it did not mention Section 290dd-2 or its associated regulations. 126 F.R.D. 444. Accordingly, that case's discussion of how to balance the "interests of justice"—which the district court quoted—was superseded by Congress's later decision to strictly define when courts may violate patient

confidentiality. *Cf.* ROA.1469. The district court must follow enacted laws, instead of sidestepping them based on its own policy considerations. *Id*.

<u>In sum</u>, the district court did not and cannot issue an order for the disclosure of patient information that complies with Part 2. Plaintiffs cannot satisfy any of the elements of "good cause" nor can they provide the district court with any evidence to allow such a finding, and the district court's discretionary power to send notice in an FLSA collective action must yield to these mandatory regulations. This Court should reverse and instruct the district court that it may not compel Cenikor to provide patient identifying information about its current or former patients.

## **<u>Conclusion And Prayer</u>**

This Court should reverse the district court's orders granting certification of the FLSA collective action and ordering Cenikor to use and disclose patient identifying information, and order that collective action is improper.

Respectfully submitted,

By: /s/ Chris Dove

David M. Gregory
Chris Dove
Andrew W. Reed
Kathleen Grossman
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
dgregory@lockelord.com
cdove@lockelord.com
andrew.reed@lockelord.com
kathleen.grossman@lockelord.com
Tel: (713) 226-1344
Fax: (713) 223-3717
**COUNSEL FOR PETITIONER**

Frank Sommerville
Texas State Bar No. 18842700
WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
3030 Matlock Rd., Suite 201
Arlington, Texas 76015
Telephone (817) 795-5046
Facsimile (800) 556-1869
fsommerville@wkpz.com
**OF COUNSEL FOR PETITIONER**

## Certificate Of Service

The undersigned hereby certifies that a true and correct copy of the foregoing Brief of Appellant was served on all counsel of record on October 25, 2022 via CM/ECF filing:

**Representing All Plaintiffs/Appellees:**
**Josh Borsellino**
Borsellino, P.C.
3267 Bee Cave Rd., Ste. 107, PMB # 201
Austin, TX 78746
Email: josh@dfwcounsel.com

**Representing Malik Aleem, John Potter, and Anthony Woods:**
**Charles Stiegler**
Stiegler Law Firm
318 Harrison Ave., Suite 104
New Orleans, LA 70124
Email: charles@stieglerlawfirm.com

**Representing John Potter and Anthony Woods:**
**James R Bullman**
Blackwell & Bullman, LLC
8322 One Calais Ave
Baton Rouge, LA 70809
Email: james@estesdavislaw.com

**Representing Anthony Woods:**
**Josh Sanford**
Sanford Law Firm, PLLC
Kirkpatrick Plaza
10800 Financial Centre Pkwy, Suite 510
Little Rock, AR 72211
Email: josh@sanfordlawfirm.com

*/s/ Chris Dove*
Chris Dove

## <u>Certificate Of Compliance With Type-Volume Limitation, Typeface Requirements, And Type-Style Requirements</u>

1.   This Petition complies with the type-volume limitation of Fed. R. App. P. 5(c)(1) because it contains **12,901** words, excluding the parts exempted by Fed. R. App. P. 5(c) and 32(a)(7)(B)(iii), and Fifth Circuit Rule 5.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 pt. Book Antiqua.

/s/ Chris Dove
Chris Dove
*Attorney for Appellant*

## Exhibit A

The names of the individuals – as reflected in PACER and/or in the periodically filed consent forms – who have filed notices of consent in one of the consolidated cases (No. 4:19-cv-1583, No. 4:19-cv-3031, 4:19-cv-3032, 4:19-cv-3033, and 4:19-cv-4569) to join as a putative opt-in plaintiff are listed below:

1.     Adams, Candice
2.     Adhosy, Dwight
3.     Alaniz, Cody
4.     Allen, Clarence
5.     Almand, Kara
6.     Anuario, Vincent
7.     Archer, II, William Edward
8.     Arnold, Colby
9.     Arrizola, Nicholas Corey
10.     Ayo, Corey
11.     Babin, Suzanne
12.     Baker, Daniel Craig
13.     Ballard, Jason Evert
14.     Barnett, Delories Kay
15.     Barnett, Jacquelin
16.     Bartholomew, Michael F.
17.     Battiste, Sean S.
18.     Baye, Stuart
19.     Belk, Timothy Wayne
20.     Bennett, Brent
21.     Berger, Alexa
22.     Bergfeld, Amber
23.     Bergfeld, Boone Blair
24.     Bergman, Christopher M.
25.     Bourgeois, Cory
26.     Bragg, Ashley
27.     Brin, Charlie
28.     Brinkley, Edward
29.     Brousseau, John Patrick
30.     Brown, Austen P.

31.     Brown, Roderic
32.     Broyles, Lucas
33.     Buchanan, Gregory
34.     Burgess, Cory
35.     Burnette, Jennifer
36.     Busby, Ethan
37.     Butler, Jason
38.     Cabrera, Brennan
39.     Campbell, James Edward
40.     Campbell, Jordan Elaine
41.     Campbell, Joshua
42.     Caperton, Matthew
43.     Cardenas, Brittney Kaye
44.     Carlson, Rodney
45.     Carroll, Christian Alice
46.     Carroll, Dustin D.
47.     Carrow, Christopher
48.     Cavness, Renee
49.     Cenkus, Ethan
50.     Cerda, Francisco
51.     Chauvin, Dorna
52.     Cheatham, Stephen
53.     Chouest, Avia
54.     Circello, Jamies
55.     Clark, Christian
56.     Clark, Daunte Darre
57.     Cloyd, Brian
58.     Cofer, Hershal
59.     Collins, Esteban
60.     Conner, Chelsea
61.     Conrad, Charles Glen
62.     Cook, Connnie
63.     Cortello, Amanda
64.     Covington, Jerry Allen
65.     Cross, Christopher
66.     Cutrer, Samuel Wayne
67.     Daniels, Mattie

68. Dansereau, Chase
69. Davis, III, Escar Wayne
70. Davis-Alvarez, Wendy
71. Decuier, Byron
72. Delesma, Mark
73. Demas, Jr., Donald Ralph
74. Devlin, Josh
75. Dobbs, Malerie Martinez
76. Duckworth, Myra
77. Dunn, Corey
78. Dunn, Dwayne
79. Dunn, Shelbey
80. Duplaisir, Daniel
81. Dupuis, David
82. Dyer, James
83. Dyer, James Andrew
84. Ellis, Vanessa
85. Ellison, Adam Joseph
86. Engle, Hiram Edward
87. Escareno, Josue
88. Eskine, Andrew J.
89. Evans, Charles
90. Fairris, Jessica
91. Featherton, Adam
92. Fiddling, Stacey
93. Fisher, Chloe
94. Fletcher, Brandon Nicholas
95. Flowers, Jesse
96. Flowers, Robert
97. Ford, Gerald
98. Forrester, Daniel
99. Franklin, Grant
100. Franklin, Ronald
101. Fraser, Lecretia
102. Freeman, Brandi
103. Fremin, Ryan
104. French, Trevor

105.    Frontz, Matthew Brady
106.    Fruge, Tina
107.    Galloway, David
108.    Gilmore, Nicole
109.    Gilpin, Dustin Cole
110.    Goodman, James
111.    Govea, Luis Rogelio
112.    Granger, Jacob Ryan
113.    Green, Calvin
114.    Green, Christopher
115.    Greenfield,  Theresa Lynn
116.    Greenshields, Theresa Lynn
117.    Guillard, Wesley
118.    Guiterrez, Andrew
119.    Handy, Ivery
120.    Harmon, Alicia Sherriff
121.    Harris, Aaron
122.    Harrison, Christopher
123.    Harrison, Jeremiah J.
124.    Hawkins, Cedric
125.    Haydel, Russell
126.    Horton, Debra Nicole
127.    Houk, Samuel W.
128.    Hyatt, Mark Richard
129.    Jackson, James Lee
130.    Jackson, Krystle
131.    Janner, Coe
132.    Jenkins, Adrian
133.    Johnson, Adam Ross
134.    Johnson, Russell
135.    Kiebach, Grace
136.    Koon, Christopher B.
137.    Lance, Mark Anthony
138.    Langford, Kaleb
139.    Lawson, Jared Scot
140.    LeBouf, Shaon Ren'ee
141.    Lirette, Beau Luke

142.    Logan, Samantha
143.    London, John Eugene
144.    Lucio, Kimberly
145.    Madden, Kevin
146.    Marino, Paul Lee
147.    Martin, Ernie
148.    Martinez, Erica
149.    Martinez, Jose
150.    Mashburn, Michael
151.    Mason, Jonathan James
152.    Mauldin, Emmanuel
153.    Mays, Shane
154.    McDonald, Austin Rayce
155.    McDonald, Jacob
156.    McKinley, Daron James
157.    McKinney, Ivan
158.    Mendow, Chris
159.    Miles, Mark
160.    Miller, Terri Rena
161.    Minshew, Eric Shane
162.    Montilla, Sanderson
163.    Mouret, Jared
164.    Nickens,  Jeramy
165.    Ostendorf, George
166.    Payne, Christopher
167.    Perez, Jim
168.    Perry, Jameson Robert
169.    Porche, Ian
170.    Porretto, Brandi
171.    Pouralifazrl,  Tiffany
172.    Prejean, Jay Arthur
173.    Primeaux, Joey
174.    Rainwater, James
175.    Ralls, Michael Hunter
176.    Rauda, Erik
177.    Renfro, Bryce Daniel
178.    Rhone, Ronald

179.    Rivas-Mcquery, Michael
180.    Rodriguez, Emmanuel
181.    Rogers, Ashley
182.    Roots, Phillip
183.    Samudio-Penick, Ginamarie
184.    Sepulvado, Hillary
185.    Smith, Douglas William
186.    Smith, Jr., William R.
187.    Smith, Timothy R.
188.    Sorrell, Jacob
189.    Spagna-Mans, Mary Ann
190.    Spanos, Jeffrey William
191.    Stephney, Christopher
192.    Stidham, Tameka
193.    Strecker, Deborah
194.    Sullivan, Brandon L.
195.    Sullivan, Joy
196.    Swink, Jeremy Wayne
197.    Sykes, James
198.    Szabo, Brandon
199.    Teran, Ricardo
200.    Thedford, Michael
201.    Thomas, Arthur
202.    Thompson, Brandon Keith
203.    Urrutia, Corey O'Keith
204.    Velasquez, Joan Manuel
205.    Veuleman, Donald
206.    Vincent, Matthew
207.    Vreeland, Michael Hayden
208.    Wachs, Dustin
209.    Walton, II, Richard Byron
210.    Ward, Jennifer Ellen
211.    Weiser, Blake Nicholas
212.    Whatley, Alana
213.    White, Katrina
214.    Williams, Alester
215.    Williams, Ronnie

216.    Williams, Shelby
217.    Williams, Vincent Cody
218.    Wilson (Tabak), Jennifer
219.    Wilson, Jeremy Logan
220.    Wilson, Jr., Charles E.
221.    Woods, James
222.    Woods, Marlon
223.    Wright, Adam Wayne
224.    Ybarra, Gregory
225.    Yongue, Shane
226.    Zimmerman, Ryan