# United States Court of Appeals
# for the Fifth Circuit

---

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2023

Lyle W. Cayce
Clerk

No. 22-20434

---

Timothy Klick; Wilton Chambers; Malik Aleem; John Potter; Anthony D. Woods,

*Plaintiffs—Appellees,*

*versus*

Cenikor Foundation,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-1583

---

Before Graves, Higginson, and Douglas, *Circuit Judges*.

Dana M. Douglas, *Circuit Judge*:

As neither a member of this panel, nor judge in active service, requested that the court be polled on rehearing en banc, the petitions for rehearing en banc are DENIED. Fed. R. App. P. 35 and 5th Cir. R. 35. The petition for panel rehearing is GRANTED. We withdraw our previous opinion and substitute the following:

Cenikor Foundation brings this interlocutory appeal challenging the district court's threshold determination that a collective action of its drug rehabilitation patients may proceed under the Fair Labor Standards Act

No. 22-20434

("FLSA" or "the Act"), 29 U.S.C. § 201, *et seq.* Finding that the district court applied the incorrect legal standard in assessing employee status, we REMAND for consideration consistent with this opinion. Additionally, we REMAND for the district court to consider whether Cenikor Foundation's offset defense precludes collective certification.

## I.

### A.

Cenikor Foundation is a 501(c)(3) nonprofit rehabilitation center assisting individuals with alcohol and/or drug addiction, as well as behavioral health issues, with locations throughout Texas and Louisiana. At issue in this lawsuit is an adult long-term inpatient treatment program ("the Program") run by Cenikor, in which patients were assigned jobs and required to work.[1]

Cenikor describes the Program in therapeutic language, calling it "vocational therapy" which involves a "highly regulated regimen with clearly stated expectations for behavior and psychological and behavioral rewards," including "morning and evening house meetings, job assignments, group sessions, seminars, personal time, recreation, and individual counseling." Appellees describe Cenikor as a "staffing agency" who has "outsourced its patients through its Work Program to work for various private companies" to its benefit.

The Program includes three specific phases: orientation, primary treatment, and reentry. During the orientation phase, lasting up to 60 days, patients "learned the rules of the program, participated in group and individual therapy, and worked with counselors to develop an individualized treatment plan." When patients entered the primary treatment phase,

---

[1] Since the summer of 2021, Cenikor had discontinued the Program.

No. 22-20434

lasting 16 to 18 months, Cenikor added "vocational therapy and training to the patients' program." The "vocational therapy" took place either in Cenikor's own facilities[2] or with one of the "community businesses" that partnered with Cenikor, and patients did not keep any of the money from their work. If patients reached the reentry phase, they were required to find full-time employment and arrange for a permanent residence and reliable transportation to complete the Program. It was only during this phase that patients began earning wages from their employer directly.

Many long-term patients received treatment for free or at a reduced rate. All patients received access to room, board, food, clothing, security, counseling, transportation, and medical care during their tenure. Every patient signed a form explaining that Cenikor's "comprehensive therapeutic treatment program includes work assignments as part of rehabilitation" and, "[r]esidents receive no monetary compensation for assigned responsibilities in the facility, or any on-the-job training during the primary treatment phase." By signing, the patients attested that "I further understand that under no circumstances can Cenikor be under any obligation to me; that I am a beneficiary and not an employee." Instead of making money off their "vocational therapy," patients attested that they understood that the funds paid to Cenikor "go directly back to the Foundation to help offset the cost of treatment services." To further offset costs, Cenikor also required patients to apply for government assistance, such as food stamps, and assign those benefits to Cenikor.

As part of the Program, Cenikor had contracts with community business partners ("outside businesses" throughout) to provide Program

---

[2] The patients who worked within Cenikor's facilities are not a part of the proposed collective.

No. 22-20434

participants for particular jobs. These outside businesses were then billed by Cenikor for the hours worked by the Program participants. In 2017, Cenikor billed these outside businesses more than $7 million for the labor of the Program participants. In 2018, Cenikor invoiced $6.9 million to these outside businesses. Cenikor was paid directly for the labor provided by the Program participants at rates contractually agreed upon between Cenikor and the outside businesses. In accordance with labor laws governing overtime pay, Cenikor also charged outside businesses an overtime premium of 1.5 times the regular hourly rate when participants worked more than 40 hours a week.[3]

Cenikor paid for workers' compensation insurance for all Program participants and marketed this benefit to potential outside business partners. The Program did not vary across locations. Cenikor decided which outside businesses its patients were assigned to, and if an outside business wished to change the job duties of a patient, it was required to first obtain Cenikor's permission to do so.

If a patient is unwilling to perform a work assignment, they would be disciplined by Cenikor, up to and including termination from the Program and removal from the facilities. Cenikor's intake forms indicated that if "unable to participate" in the Program, participants would "be subject to termination from Cenikor."

**B.**

---

[3] The contract with the outside businesses regarding overtime pay provided: "Vocational workers are presumed to be *nonexempt from laws requiring premium pay for overtime and holiday work*, or weekend work." (emphasis added). Although the contract clearly identified Cenikor's patients as "nonexempt" from laws requiring premium pay, its CFO testified that it was intended to mean the patients were considered "volunteers." However, Cenikor could and did bill these outside businesses overtime whenever a patient worked more than 40 hours in a week.

No. 22-20434

In 2019, after the Center for Investigative Reporting published a series of podcasts and articles "reporting that Cenikor had sent thousands of individuals in Louisiana and Texas to work without monetary compensation at major companies such as Walmart, Shell, and ExxonMobil," various plaintiffs filed six different lawsuits against Cenikor in three different federal district courts. Named plaintiff Klick filed the first suit in the Southern District of Texas, and all lawsuits were transferred to that court and consolidated on February 25, 2020. Shortly after the case was filed, the plaintiffs filed motions for conditional certification under the then-widely used framework for conditional certification established in *Lusardi v. Xerox Corp.*, 118 F.R.D. 341 (D.N.J. 1987). Following this court's decision in *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430, 434 (5th Cir. 2021), which rejected the *Lusardi* framework, and because Plaintiffs indicated that they would file an amended motion for certification following pre-certification discovery, the district court found the pending motions were moot and denied them without prejudice.

The parties then exchanged written discovery and held depositions of the named plaintiffs and a Rule 30(b)(6) corporate representative of Cenikor. A total of 226 individuals consented to join the lawsuit as plaintiffs of the 2,736 individuals that had participated in the Program since May of 2016.

Following a renewed motion for certification, the district court certified a collective action under the FLSA. Specifically, the district court certified a "proposed class of individuals who participated in the primary phase of Cenikor's long-term residential program from May 2016 to the present and performed work for outside businesses or individuals without monetary compensation." Cenikor filed this interlocutory appeal pursuant to 28 U.S.C. § 1292 and now asks this court to reverse the district court's decision to certify a collective action.

No. 22-20434

## II.

This court reviews the appropriate legal standard to apply when determining whether an individual is an employee under the FLSA de novo. *Swales*, 985 F.3d at 439. Once the correct legal standard is ascertained, we review the district court's decision certifying a collective action for abuse of discretion. *Id.* "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005).

## III.

The Fair Labor Standards Act of 1983 created "a comprehensive federal wage-and-hour scheme." *Aldridge v. Miss. Dept. of Corrs.*, 990 F.3d 868, 871 (5th Cir. 2021). Congress enacted the FLSA to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general wellbeing of workers." *Id.* The principal purpose of the Act is "to protect all covered workers from substandard wages and oppressive working hours." *Id.* (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)). Workers covered under the Act are entitled to a minimum wage and overtime compensation. 29 U.S.C. §§ 206-07.

"The FLSA protects employees (not independent contractors) . . . ." *Swales*, 985 F.3d at 434. Moreover, collective actions may only proceed under the FLSA so long as the potential members are "similarly situated." *Id.* at 433. "District courts should 'rigorously enforce [the FLSA's similarity requirement] at the outset of the litigation." *Id.* at 443. In determining whether "employees" are "similarly situated," district courts must scrutinize all facts and legal considerations material to determining such status, including merits questions. *Id.* at 434, 441-42. Here, where a merits question is wrapped up in a threshold determination—whether the

rehabilitation patients are considered employees entitled to compensation under the FLSA—the dispositive threshold issue must be resolved before a collective can be certified and notice can be sent. *See id.* at 441 ("The fact that a threshold question is intertwined with a merits question does not itself justify deferring those questions until after notice is sent out.").

However, we emphasize that a threshold determination is not a resolution of the merits question itself. Instead, a threshold determination should consider whether the merits question may be answered on a collective basis and should not serve as an endorsement of the ultimate outcome in the case. *Swales*, 985 F.3d at 434 (discussing the importance of avoiding "signal[ing] approval of the merits"); *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 174 (1989) ("[T]rial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action.").

## A.

Cenikor argues that the district court applied the wrong legal standard to determine whether Cenikor's patients were FLSA "employees." Appellees argue that the district court properly applied binding Supreme Court precedent to the facts of this case in finding that the employment question may be decided on a collective-wide basis.

Collective actions can be certified as to the very question of whether a specific group of individuals qualify as "employees" under the FLSA. *See Hobbs v. Petroplex Pipe and Const., Inc.*, 946 F.3d 824, 828-29 (5th Cir. 2020). While the determination of whether an individual is an "employee" is a matter of law, there are often associated factual inquiries required before such a determination can be made. The ultimate determination turns on the "economic reality" of the relationship between the parties involved. *See Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 301 (1985). An evaluation of economic reality, in turn, depends on the totality of the

circumstances. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). Two Supreme Court decisions are central to this analysis—*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947) and *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985).

*Walling* involved a FLSA minimum wage claim against a railroad company that offered training for prospective yard brakemen, which would typically last seven or eight days. 330 U.S. at 149. Trainees were not paid for work they performed during the training program, nor did they expect any compensation, except that the railroad company might hire them at the end of the training period and retroactively compensate them for work performed during the training period. *Id.* at 150. The trainees' work did "not expedite the company business" but sometimes impeded it. *Id.* The Court held that the trainees were not "employees" under the FLSA. *Id.* at 153. Holding otherwise would "deprive [the trainees] of all opportunity to secure work, thereby defeating one of the [FLSA's] purposes, which was to increase opportunities for gainful employment." *Id.* at 151. Further, a person who, "without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit," is outside the scope of the FLSA. *Id.* at 152.

In *Alamo*, the Court expanded its *Walling* analysis. The Alamo Foundation, a nonprofit religious organization, derived its income largely from the operation of commercial businesses staffed by its "associates," most of whom were "drug addicts, derelicts, or criminals" before their rehabilitation at the Foundation. *Alamo*, 471 at 292. The associates received no cash salaries, but were provided with "food, clothing, shelter, and other benefits." *Id.* The Secretary of Labor filed an action against the Foundation alleging violations of the minimum wage, overtime, and recordkeeping provisions of the FLSA. *Id.* at 293.

No. 22-20434

As in *Walling*, the Court stated that "an individual who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit, is outside the sweep of the [FLSA]." *Id.* at 295 (internal quotation marks and citation omitted). Although the Foundation's associates protested coverage under the Act, the Court determined this was not dispositive because the test of employment is one of "economic reality." *Id.* at 301. The fact that the compensation was primarily in the form of benefits, rather than cash, was "immaterial" in this context since such benefits are "wages in another form." *Id.* Because the associates received in-kind benefits and were dependent on the Foundation for long periods of time, the Court held that the district court did not clearly err in finding they were "employees" within the meaning of the Act. *Id.*

Here, the district court concluded that it was appropriate to apply the economic realities test set forth by our court in *Hopkins v. Cornerstone America*, 545 F.3d 338 (5th Cir. 2008), to determine whether the rehabilitation patients were employees under the FLSA. Although it shares the same name as the Supreme Court's test in *Alamo*, the economic realities test was established to distinguish employees from independent contractors. *Hopkins*, 545 F.3d at 343-44. The *Hopkins* test considers (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* at 343 (citing *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1043-44 (5th Cir. 1987)).

In some ways, this test is inapposite. For example, the opportunity for profit or loss, or the relative investment in the business, are unlikely to be relevant when considering whether a rehabilitation patient is an employee.

No. 22-20434

*See Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 433 (4th Cir. 2011) ("[T]he test is best suited to determine whether, as a matter of economic reality, an individual is in business for himself or herself as an independent contractor . . . [and] is of limited utility in determining whether an individual is an employee, as opposed to a volunteer.") (internal quotation marks omitted). There is also some tension between this test and the instruction in *Walling* and *Alamo* that a court must consider whether the employee had an "expectation of compensation." *Walling*, 330 U.S. at 152; *Alamo*, 471 U.S. at 302. Whether a worker is an independent contractor or an employee, there is no doubt that both have an expectation of compensation.

Circuit courts applying *Walling* and *Alamo* to rehabilitation patients have relied on a primary beneficiary analysis, a test commonly applied when evaluating whether volunteers, trainees, and interns are "employees" under the FLSA. *See, e.g., Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141, 145-46 (2d Cir. 2020); *Fochtman v. Hendren Plastics, Inc.*, 47 F.4th 638, 645 (8th Cir. 2022); *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 452 (4th Cir. 2021) (unpublished).

In *Vaughn*, the plaintiff entered a residential drug and alcohol treatment program at Phoenix House pursuant to a state-court-approved agreement to participate in a rehabilitation program, in lieu of incarceration for existing criminal charges. 957 F.3d at 144. Vaughn did not want to perform his work duties but was told that if he was removed from the program for noncompliance, he would go to jail, so he performed work responsibilities at Phoenix House for a little less than a year. *Id*. Vaughn then attempted to bring claims under the FLSA, but the Second Circuit held that he was not an "employee" under the FLSA. *Id*. at 146.

The Second Circuit endorsed the district court's application of a primary beneficiary test. *Id*. at 145. It emphasized the "three salient

No. 22-20434

features" of its primary beneficiary analysis, previously used to assess the nature of the relationship between an intern and his employer: (1) its focus on what the intern receives in exchange for work, (2) its flexibility to evaluate the economic reality of the relationship, and (3) its acknowledgement of considerations unique to intern-employer relationships, such as the educational or vocational benefits to the intern.[4] *Id.* In applying the primary beneficiary test, the Second Circuit noted that Vaughn was not an employee despite having "received significant benefits from staying at Phoenix House, in large part because he was permitted to receive rehabilitation treatment in lieu of a jail sentence, and was provided with food, a place to live, therapy, vocational training, and jobs that kept him busy and off drugs." *Id.* (quotation marks and citation omitted).

---

[4] The Second Circuit applies the following non-exhaustive list of factors:

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Vaughn*, 957 F.3d at 145-46.

No. 22-20434

Likewise in *Fochtman v. Hendren Plastics, Inc.*, the Eighth Circuit did not extend employee status to court-ordered participants of a nonprofit drug and alcohol recovery program ("DARP"). 47 F.4th 638, 641 (8th Cir. 2022). The participants could avoid imprisonment in a criminal case by agreeing to participate in DARP, which provided them with room, board, clothing, and other necessities, without charging costs or fees to participate. *Id.* DARP provided transportation to for-profit businesses, but did not compensate participants for their work, despite collecting an hourly rate from the for-profit businesses for the time worked by participants. *Id.* The Eighth Circuit found that "the overriding consideration is that the DARP participants undertook the recovery program for their own purposes to avoid imprisonment, and they had no reason to expect compensation from [the recovery program]." *Id.* at 646.

Although not expressly described as a primary beneficiary analysis, we have utilized the primary beneficiary test when determining whether flight attendant trainees were employees entitled to FLSA protections. *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267 (5th Cir. 1982). In *Donovan*, American Airlines benefitted from requiring unpaid training, but the trainees were not employees because they attended "for their own benefit, to qualify for employment they could not otherwise obtain." *Id.* at 272. Further, American Airlines did not receive an *immediate* benefit from the trainees' activities, as they were not productive until after the training session ended. *Id.* In addressing an outlier decision that determined FLSA applied to a trainee, we noted that it reinforced our conclusion because the trainee "substituted for hired personnel, was included as a member of the full crew . . . and, during training, performed tasks necessary to the ship's functioning." *Id.* at 273 (citing *Bailey v. Pilots' Assoc. for the Bay & River Del.*, 406 F.Supp. 1302 (E.D. Pa. 1976)). This bolstered our conclusion because in *Bailey*, the pilots' association, rather than the trainee, was receiving the most benefit from the

arrangement. *See id.* Thus, although the words were not explicitly used, we determined that the flight attendants were the primary beneficiaries of the relationship, not American Airlines. *See id.*

The district court was understandably hesitant to apply this analysis because it "has not been endorsed by the Fifth Circuit in the context of rehabilitation services." Today, we endorse it. In light of the court's responsibility to assess the economic reality between the parties, a fact-intensive inquiry which requires a careful evaluation of the totality of the circumstances, we find that a primary beneficiary test provides a helpful framework for discerning employee status. Non-exhaustive factors to consider include the plaintiffs' expectation of compensation, the therapeutic value of the Program, whether the relationship displaces paid employees, and any other considerations that may "shed light on which party primarily benefits from the relationship." *See Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1018 (6th Cir. 2020) (quoting *Solis v. Laurelbrook Sanitarium and School, Inc.*, 642 F.3d 518, 529 (6th Cir. 2011) (applying primary beneficiary analysis to students in a training environment)). These considerations are remanded to the district court to apply in the first instance.

## B.

Cenikor also takes issue with the district court's finding that the rehabilitation patients were "similarly situated" to each other for purposes of certifying a collective action. As noted, plaintiffs bear the burden of proving a collective is similarly situated. *Swales*, 985 F.3d at 442-43. The statute, however, does not define "similarly situated." *Id.* at 435. As this court explained in *Swales*, "to determine if and when to send notice to potential opt-in plaintiffs," "a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Id.* at 441.

No. 22-20434

A showing that members of a collective action are similarly situated does not require members to be identically situated but requires plaintiffs to show a demonstrated similarity between the purported collective, such as a factual nexus that binds the claims together so that hearing all claims in one proceeding is fair to all parties and not beset with individual inquiries. *See id.* at 443. This requires a consideration of proposed defenses to determine whether they are so individualized that denial of certification is required.

After the completion of preliminary discovery, the district court determined that the evidence and testimony showed that the key aspects in considering whether an employer-employee relationship exists may be resolved on a collective-wide basis because: (1) all patients signed the same paperwork disclaiming employee status and stating they would not be paid during the primary phase; (2) the paperwork promised that Cenikor would provide all basic personal needs including housing, food, emergency medical care, and clothing; (3) all plaintiffs agreed to perform work to receive these in-kind benefits; (4) all program participants received their work assignments and schedules from Cenikor; and (5) all plaintiffs were subject to the same organization-wide policies and procedures irrespective of location. Ultimately, the district court concluded that it could address whether the primary phase participants were FLSA employees on a collective basis because all proposed members were subject to a company-wide policy in which they performed labor without monetary compensation.

Cenikor argues that its rehabilitation patients are not similarly situated and that the district court's decision contravenes *Swales*. Appellees contend, however, that they have shown the patients were similarly situated and the district court correctly determined that these defenses could be addressed collectively.

No. 22-20434

We turn to Cenikor's three proposed defenses—the Motor Carrier Act ("MCA") exemption, the *Rooker-Feldman* doctrine, and the offset defense. The district court concluded that these defenses were either inapplicable or that Cenikor had not, at this stage, demonstrated they would require individualized inquiries.

To qualify for the MCA exemption, a loader aka "an employee of a carrier" must have duties that include, "among other things, the proper loading of his *employer's* motor vehicles." 29 C.F.R. § 782.5(a) (emphasis added). Here, there is no allegation that any of the outside businesses were the patients' employer. Instead, Cenikor is the sole employer defendant. Accordingly, the MCA defense does not apply to any individual patient.

As to the *Rooker-Feldman* doctrine, the Fifth Circuit recognizes, in conformity with the Supreme Court, that *Rooker-Feldman* is a narrow jurisdictional bar. *See Truong v. Bank of America, N.A.*, 717 F.3d 377, 381-82 (5th Cir. 2013) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The doctrine applies only "where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." *Lance v. Dennis*, 546 U.S. 459, 466 (2006). Here, this doctrine has no bearing on the alleged FLSA claims. Appellees are not "state court losers" who are challenging state court decisions that require them to attend Cenikor's rehabilitation treatment center in lieu of serving jailtime. Rather, they are challenging Cenikor's decision not to pay them for their labor in violation of federal law. Thus, the *Rooker-Feldman* doctrine is inapplicable to this case.

Regarding the offset defense, the district court credited plaintiffs' argument that the calculations could be completed on a class-wide basis "by subtracting aggregate costs from aggregate payments and dividing by the number of participants to determine an average." However, the evidence to

No. 22-20434

support this is not fully developed.  Because *Swales* requires that "[d]istrict courts . . . 'rigorously enforce [the FLSA's similarity requirement] at the outset of the litigation," 985 F.3d at 443, we remand this defense for fuller consideration before concluding the proposed collective is similarly situated. The district court should explicitly consider whether there are wide and obvious liability variations that would pose a "threshold" issue "bar[ring] application of the FLSA." *Swales*, 985 F.3d at 441.   Accordingly, we REMAND to engage more with Cenikor's offset defense.   Because we remand, we do not address Cenikor's arguments that the district court erred in requiring it to send notice to potential opt-in plaintiffs.

## IV.

Because we conclude that the district court applied the incorrect legal standard in assessing employee status and did not engage directly with the offset defense as required prior to certifying a collective, we REMAND for consideration consistent with this opinion.



**Certified as a true copy and issued as the mandate on Feb 02, 2024**

**Attest:**   *Jyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**